IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 21, 2010 Session

## JAMES McKAY ANDREWS
v.
## SUSIE HEASOOK CHO ANDREWS

**Appeal from the Circuit Court for Shelby County**
**No. CT-000708-06      Walter C. Kurtz, Senior Judge**

_____

**No. W2009-00161-COA-R3-CV - August 31, 2010**

_____

This is a divorce case. The plaintiff husband is a successful physician and the defendant wife is a stay-at-home mother. They have one minor child. After twelve years of marriage, the husband left the marital home and filed for divorce. The wife counter-claimed for divorce, and protracted and contentious litigation ensued. The initial trial judge appointed a guardian ad litem and an attorney ad litem. After several trial judges recused themselves, a senior judge was assigned. After nearly three years of dispute, the case proceeded to trial. The trial court granted a divorce to the wife; it found that she was economically disadvantaged but capable of partial rehabilitation, and that the husband had the ability to pay spousal support. The wife was awarded alimony _in futuro_, rehabilitative alimony, attorney fees as alimony _in solido_, and discretionary costs. The husband appeals the award of alimony, attorney fees, and costs. We affirm, finding no abuse of the trial court's discretion under the circumstances.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J. and J. STEVEN STAFFORD, J., joined.

Donald Capparella, Nashville, Tennessee, for the appellant, James McKay Andrews

Laura D. Rogers, Memphis, Tennessee, for the appellee, Susie Heasook Cho Andrews

# OPINION

## FACTS AND PROCEDURAL HISTORY

### *Background*

Plaintiff/Appellant James McKay Andrews, M.D. ("Husband"), and Defendant/Appellee Susie Heasook Cho Andrews ("Wife") married on December 30, 1993 in Atlanta, Georgia.[1] It was Husband's second marriage and Wife's first marriage. Their marriage produced one child, a son ("Son"), born in March 1995.

Husband earned his medical degree in 1985, completed an almost four-year residency in internal medicine and then a two-and-a-half-year pulmonary residency, all in Memphis, Tennessee. After completing his residencies, Husband moved to Oak Ridge, Tennessee to work in private practice as a pulmonary physician. In Oak Ridge, Husband's first marriage ended in divorce, and he met Wife.

At the time of the marriage, Husband was thirty-four years old, and Wife was thirty-six years old. Wife graduated from college with a degree in economics. After college, Wife worked as a software salesperson for a computer company. When she met Husband, Wife had been selling computer software for three or four years.

In 1993, Husband took a position with a multi-specialty practice in Canton, Georgia, a suburb of Atlanta. Wife accompanied Husband to Georgia, and they married just before Husband started his new job. Around the time the parties married, Wife left the workforce to be a full-time homemaker. In March 1995, Wife gave birth to their son and remained at home to take care of him.

Around the time of the son's birth, Husband engaged in an extramarital affair with an employee of the hospital in which he practiced. After Wife discovered the affair, the parties resolved that they wanted to remain married. As a result, they spent several months attending weekly counseling sessions with a psychiatrist.

The parties in fact remained married, but the emotional health of the relationship is the subject of some dispute. From Wife's standpoint, after she recovered from the initial distress of learning of Husband's infidelity, and after the intensive counseling, the couple returned to a mostly normal status, with regular marital relations. Husband's view of the relationship differed greatly. From Husband's perspective, despite the intensive counseling, Wife

---

[1]Both Husband and Wife are represented on appeal by attorneys who did not represent them in the trial court.

remained angry at Husband and punished him by making him tell all family members of his indiscretion and by engaging in regular verbal abuse, even in the presence of the parties' son. From Husband's description, he accepted Wife's abuse out of guilt for having been unfaithful. Husband said that he and Wife were seldom intimate. Both parties agree that Husband worked long hours in his medical practice; Husband would later explain that his long working hours were in part an escape from his unhappy home life.

For the next few years, the family continued to reside in Georgia. Husband eventually became dissatisfied with his employment in Georgia. In 2001, the parties decided to move to Memphis, so that Husband could join a medical practice with old friends and earn more money.

In Memphis, Husband began practicing with Mid-South Pulmonary Specialists, P.C. ("MSPS"). Initially, Husband was an employee of MSPS, but after two years he became a partner. Typically, Husband worked a total of sixty hours over a span of four days each week at MSPS. MSPS paid Husband a regular annual salary of $195,000 plus substantial quarterly bonuses.

In addition to his practice at MSPS, Husband did "moonlighting" at St. Francis Hospital ("St. Francis") in Memphis. At St. Francis, Husband served as an in-house critical care doctor, spending the night at the hospital the nights that he worked there. Typically, he worked at St. Francis two weekends out of each month, as well as a few weeknights each month. From his moonlighting at St. Francis, Husband earned from $12,000 to $15,000 per month.

Meanwhile, Wife continued as a homemaker and the primary caregiver for the parties' son. Son was enrolled in a private elementary school, and Wife volunteered almost daily at Son's school. She also regularly did volunteer work in the community.

In 2001, when the family moved to Memphis, they resided for a time in a rented house. In 2004, the parties purchased a home in Germantown, Tennessee, a suburb of Memphis. Standing three stories tall, the Germantown house had 8100 square feet, at least five bedrooms, a pool, and a theater room. The parties purchased the home for $1.35 million. Once the parties purchased the Germantown house, they put their Georgia home on the market for sale. It did not sell for some time.

After the family moved to Memphis, Husband began another extramarital relationship. The relationship began towards the end of 2003, and continued for about three or four years. Husband also engaged in another brief relationship as well. By all accounts, Wife remained unaware of Husband's extramarital relationships in Memphis until after the parties separated.

### *Pretrial Proceedings*

On February 7, 2006, Husband left the marital residence with little more than a few items of clothing. Husband maintains that his departure came after an especially rancorous argument in which Wife demanded that he move out of the parties' home until the next month. By Wife's account, Husband simply left, with no warning. By all accounts, Husband did not talk to the parties' son about his departure until after it occurred.

At about the same time that Husband left the marital home, he apparently withdrew the majority of the available funds from the parties' joint bank accounts. He left about $2000 in one account for Wife's use and apparently cancelled Wife's access to the parties' joint credit cards.

Two days after he left the marital home, on February 9, 2006, Husband filed a complaint for divorce in the Shelby County Circuit Court.[2] In the complaint, Husband sought a divorce on the grounds that Wife had engaged in inappropriate marital conduct and that irreconcilable differences existed between the parties. He asked for an equitable division of the marital estate and designation as the primary residential parent for the parties' child. The complaint requested an award of child support, alimony, and attorney fees, as well as the appointment of a guardian ad litem.

The next day, Wife was served with a copy of the complaint. Around the same time, she learned that she no longer had access to the parties' funds. In response to Wife's petition, the trial court issued a mandatory injunction requiring Husband to deposit monies in an account in Wife's name. In addition, both parties were required to provide an accounting of all funds in their possession or control. Wife also filed the first of many motions for an interim award of attorney fees and litigation expenses,[3] which was granted. A hearing before the divorce referee on *pendente lite* support was set for early March 2006.

In anticipation of the *pendente lite* hearing before the divorce referee, both parties filed affidavits of income and expenses. Husband's affidavit stated that he earned a gross income of $57,980 per month with expenses of $33,586 per month. Husband's income figure did not include income earned from St. Francis, and his expenses included expenses for Wife and Son. Wife's affidavit stated that she had no source of income and had expenses of $48,677

---

[2]The notary public's acknowledgment indicates that the notary public witnessed Husband sign the complaint on February 6, 2006.

[3]The record indicates that Wife filed four similar motions from May 2006 to July 2008. Some were granted in part and others were denied.

per month. After the hearing, the divorce referee recommended that Husband make temporary support payments of $29,500 per month to Wife, and also pay the mortgages on the parties' Georgia and Germantown houses. Husband appealed the referee's ruling for a *de novo* hearing before the trial judge.

Meanwhile, Wife answered Husband's complaint and counterclaimed for divorce. She admitted irreconcilable differences, denied Husband's other allegations, and asserted that Husband had engaged in adultery and inappropriate marital conduct.[4] Wife asked to be designated as primary residential parent. She sought an equitable division of the marital estate, alimony, child support, and attorney fees.

In March 2006, the trial court entered an order granting Husband parenting time with the parties' son every other weekend and every Tuesday evening. The order required Husband to refrain from working during his parenting time.

On March 30, 2006, the trial court entered an interim order appointing an attorney as the guardian ad litem ("GAL") for the parties' son. The GAL was ordered to investigate "all relevant matters pertaining to the best interest of the child in the pending divorce" and to provide the trial court with a comprehensive and detailed report of the investigation within thirty days of trial. The order stated that the GAL was to act in accordance with the American Bar Association's *Standards of Practice* for Best Interests Attorneys representing children in child custody cases,[5] "unless otherwise set forth in this Order." ***See*** American Bar Association, *Standards of Practice for Lawyers Representing Children in Custody Cases* § 5 (2003) [hereinafter "A.B.A. Standards"].

In addition, with the consent of the parties, the order appointing the GAL included numerous provisions addressing testimony by the GAL and use of the GAL's report:

> 15. As necessary, the GAL shall submit a comprehensive and detailed Report of the investigation pursuant to this Order to the Court and to Counsel for the parties within thirty (30) days prior to trial. Such Report may be utilized by the Court and the Court's ultimate decision of the best interest of said child.

---

[4] In her original counterclaim, Wife only asserted inappropriate marital conduct and irreconcilable differences as grounds for divorce. Pursuant to a consent order, Wife subsequently amended her counterclaim to add adultery as an additional ground for divorce.

[5] The *A.B.A. Standards* describe a Best Interests Attorney and a Child's Attorney: "[T]he Best Interests Attorney investigates and advocates the best interests of the child as a lawyer in the litigation, while the Child's Attorney is a lawyer who represents the child as a client." A.B.A. Standards, *supra*, § 2 cmt.

16.  Said investigative Report shall include a separate section of the GAL's conclusions and recommendations as to the best interest of said child which may be considered by the Court and shall not be binding in any way upon the Court.

17.  Further, the parties acknowledge that the Report may contain hearsay. The parties agree by consent to waive objection to hearsay contained in the Report and as it relates to the testimony of the GAL.[6]

18.  The Report of the GAL shall be forwarded to both Counsel for the parties and to the Court, but shall not be filed with the Court without permission of both parties and the Court and shall only be disseminated to the parties by future order of the Court.

19.  The parties shall not read the report of the GAL; however, the report may be discussed with the parties.  The parties shall not receive copies of the report of the GAL.

20.  The GAL may testify.[7]

21.  The parties further stipulate that the GAL shall be deemed an expert for the purposes of giving opinion testimony and recommendations and the GAL's qualifications shall not hereafter be an issue as to the admissibility of the GAL's testimony, but shall be admissible as to the proper amount of weight to be given to the testimony by the Court.[8]

22.  The Court retains its authority to exclude the opinion of the GAL in its ultimate consideration or give the testimony the weight the Court deems proper.

23.  The parties further stipulate that the GAL shall be entitled to function both as attorney for the best interests of the child and as witness, if necessary, and that any potential or actual conflict of interest that arises as a result of this role is hereby waived by consent of the parties.  The parties thereby consent to

---

[6]In *Toms v. Toms*, 98 S.W.3d 140, 144 (Tenn. 2003), the Tennessee Supreme Court held that the report of a guardian ad litem constitutes hearsay.

[7]The Supreme Court in *Toms* stated that, in lieu of admitting a guardian ad litem's report into evidence, a guardian ad litem "should testify . . . and be subject to cross-examination." *Toms*, 98 S.W. 3d at 144.  The *Toms* Court said, however, that a guardian ad litem's report could be "reviewed" by the trial court. *Id.*

[8]The record does not indicate whether the GAL appointed in this case had specialized training or other background that would qualify her as an expert, or the parameters of her stipulated area of expertise.  The *A.B.A. Standards* recommend that a lawyer representing children in custody cases, such as a Best Interests Attorney, have training in areas such as children's development, family dynamics and dysfunction, and communicating with children.  A.B.A. Standards, *supra*, § 6(B).

waive objection under the cannons of ethics as it may relate to the testimony of the GAL.[9]

The order required Husband to pay the GAL's initial retainer, with additional fees considered as child support.

Following the appointment, the GAL commenced her investigation. She interviewed both parties and they provided her a list of thirty-six witnesses to interview. After the GAL interviewed the parties, she was concerned by their starkly contrasting accounts of the marriage, so she sought a Rule 35 psychological evaluation.[10] To that end, a consent order was entered requiring both parties to undergo a mental examination.

In the course of her investigation, the GAL received numerous documents concerning the parties' son and interviewed witnesses suggested by the parties. She met with Son on multiple occasions, as well as Son's therapist.

Meanwhile, in May 2006, the parties received an offer to purchase their Georgia house, which had apparently been on the market since 2004. Eventually, the parties accepted the offer and sold the house, netting proceeds of $375,063. The proceeds were placed in escrow. A couple of months later, Husband purchased a separate residence in Memphis for about $280,000, utilizing a 100% loan. During the pendency of the case, he made between $140,000 and $150,000 in improvements to this house, including landscaping, a new driveway, a new screened-in porch with a fireplace, as well as a hot tub, a big-screen television, and sound system.

In July 2006, the trial court heard Husband's appeal from the divorce referee's ruling. After the hearing, the trial court vacated the referee's ruling and entered an order reducing Husband's *pendente lite* support obligation to $12,480 per month.[11] Husband was ordered to continue paying the mortgage on the Germantown house, and Wife was ordered to pay Son's tuition. The proceeds from the sale of the Georgia house were divided evenly; however, Husband's $46,000 accumulated arrearage on his *pendente lite* obligation under the referee's ruling was deducted from Husband's share of the proceeds. Both parties were ordered to pay their own attorney fees and litigation expenses from the proceeds.

---

[9]The *A.B.A. Standards* state that a Best Interests Attorney advocates on behalf of the child in the litigation, but is not a witness. A.B.A. Standards, *supra*, §§ 2 cmt., 3 cmt.

[10]TENN. R. CIV. P. 35.

[11]The trial court's order specified that the support obligation was half alimony and half child support.

By September 2006, the GAL had substantially completed her investigation and was prepared to make a recommendation regarding the permanent parenting plan. In light of her investigation, the GAL recommended that Wife be designated as primary residential parent and that Husband have residential parenting time every other weekend and every Tuesday. Although Husband was not happy with the GAL's proposed parenting plan, he informed the GAL that he would accede to her recommendation. Wife apparently did not directly respond to the GAL's recommended parenting plan.

The ensuing months, nay, years, brought a nearly never-ending succession of disputes, large and small. Some were essentially property issues, such as disputes over whether the parties' expansive Germantown home should be sold.[12] Many disputes involved parenting issues, with the parties' only child as the unhappy pawn. The disputes ranged from the substantive to the trivial, including Husband's consumption of alcohol while Son was with him, which parent should assist Son in preparing for tests, whether Son should attend an "away" summer camp, whether Son's clothes sent to Husband's home were returned to Wife, and on and on.

For reasons that do not appear in the record, after the conclusion of her initial investigation, the GAL became involved in virtually all of the parties' ongoing disputes that concerned Son. She dealt directly with the parties, Son, the therapists for Son and for both parties, and others, essentially investigating and mediating or arbitrating each such dispute. The genesis of this role is unclear, as it is not expressly contained in the description of the GAL's role in the order of appointment.[13] Regardless of the reason, that is the role that evolved for the GAL.

Before long, a poisonous relationship developed between Wife and the GAL. Wife withdrew from communicating directly with the GAL, the GAL expressed frustration and vexation with Wife, which caused Wife to feel threatened by the GAL and seek removal of the GAL, which further rankled the GAL and thwarted her mediation/facilitation efforts.

By May 2007, the conflict between Wife and the GAL had escalated to the point that the GAL filed a motion for the appointment of an attorney ad litem ("AAL"). The motion was granted and the trial court entered an order appointing the AAL. The order, however, had no parameters for the authority of the AAL or even any description of the AAL's role; the

---

[12]Apparently the parties bought the Germantown home near the "top" of the market. As their dispute over whether to sell the home dragged on, the housing market deteriorated, resulting in substantial "negative equity" in the house, which made selling the house even more challenging. Meanwhile, the sizeable mortgage payments and maintenance costs continued unabated.

[13]There is some indication in the record that either Wife or Husband or their attorneys initially enlisted the assistance of the GAL with complaints about the other party's parenting or to arbitrate or mediate parenting disputes.

order simply stated that the AAL was "appointed for any purpose."[14] As things turned out, the AAL advocated and filed pleadings on behalf of the GAL. When the AAL filed pleadings, such as discovery requests served on Wife, these drew objections from Wife, to which the AAL responded with motions to compel. These exchanges provoked further efforts by Wife to terminate the GAL, as well as a complaint against the GAL with the Board of Professional Responsibility. And so on.

Wife's conflicts with the GAL and the AAL did not deter the parties from engaging in disputes with one another, in the form of a wide variety of motions, cross-motions, requests for sanctions, petitions for contempt, motions to disqualify counsel, and other such pleadings, and even the execution of a search warrant on a lawyer's office. All of these were interspersed with motions by Wife seeking the recusal of the trial judge. Mediation was ordered, to no avail. Trial settings came and went; the case was set for trial, continued, and reset at least six times.[15] Both Husband and Wife changed lawyers. The ongoing proceedings were punctuated by periodic requests by Wife to file an interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure; the trial court granted one such request, only to have permission to appeal denied by the appellate court.

In January 2008, the initial trial judge entered an order of recusal. Thereafter, the case ricocheted among the different divisions of the Shelby County Circuit Court and the Chancery Court. At various times, matters relating to the case were heard by five different trial judges. In July 2008, the Tennessee Supreme Court entered an order assigning Senior Judge Walter C. Kurtz to hear the case. Following the designation, Judge Kurtz entered a scheduling order setting the case for trial in November 2008. Consonant with the order of the initial trial judge, under Judge Kurtz's scheduling order, the parties were required to file supplemental accountings no less than two weeks before the scheduled trial.[16] The parties were also ordered to file updated affidavits of income and expenses prior to trial.

---

[14]The order as initially drafted stated that the AAL was appointed "to advocate and protect the best interest of the minor child at such times as the [GAL] may be called to testify in this cause." This language was crossed out and replaced with "for any purpose."

[15]The initial trial setting in June 2007 was utilized for the trial court to consider a temporary parenting plan. The trial court adopted the GAL's recommended parenting plan. The same hearing, however, spawned a motion to terminate the GAL, a motion for Rule 11 sanctions, a motion for recusal of the trial judge, and a motion for permission to file an interlocutory appeal. All of these motions were denied.

[16]In anticipation of a trial date scheduled for October 2007, which was later continued, the parties had filed accounting statements in accordance with the trial court's prior order.

In accordance with the scheduling order, in October 2008, the parties filed supplemental accounting statements. The same month, Husband and Wife each filed a Rule 14(c) affidavit of current income and expenses.[17] Husband's affidavit showed that he continued to earn substantial income from his work at MSPS and St. Francis, but that his outflow was more than he earned, in order to meet his *pendente lite* obligations, service the marital debt, and pay his own monthly living expenses. In her affidavit, Wife stated that she remained a full-time homemaker and caregiver for the parties' son, with no separate source of income. Wife's affidavit asserted that she anticipated that her already considerable monthly expenses would rise by some $20,000 per month after the divorce.

As the trial date approached, the parties' proposed parenting plans differed only slightly on the residential parenting schedule; they agreed that Husband would have residential parenting time every other weekend plus one day, but differed in minor respects such as which day of the week should be Husband's extra day. They disagreed in a few other respects, such as which parent should be the primary decision-maker in areas such as the son's medical care. Despite the many parenting disputes that had occurred, this had more or less been the status of their proposed parenting plans since Husband indicated in the fall of 2006 that he would acquiesce in the GAL's interim recommended parenting plan.

As of the scheduled trial date, the parties' Germantown house remained unsold, requiring continued payment of the $8400 per month mortgage, plus substantial maintenance costs.

By the time of trial, the GAL filed a roughly 375-page report, half of which were her interview summaries and recommendations, with the other half consisting of correspondence with the parties and their attorneys, mostly on the countless parenting disputes, and various exhibits. By September 30, 2008, a month before trial, the record indicates that the AAL's fees were over $78,000 and the GAL's fees were over $138,000. The total attorney fees for the parties, excluding the fees of the GAL and the AAL, were well over $675,000. Some of these fees were paid in advance of trial, but much remained unpaid.

### *Trial*

In November 2008, the trial court conducted a five-day bench trial. Issues pertaining to the fees of the GAL and the AAL were reserved for a post-trial hearing. At trial, Judge Kurtz heard testimony from thirteen witnesses, including Husband, Wife, and the GAL. Seventy-nine exhibits were entered into evidence.

---

[17]R. CIR. CT. THIRTIETH JUD. DIS. 14(c).

The GAL testified at the outset of the trial, with direct examination by Husband's trial counsel, cross-examination by Wife's attorney, and questions by the AAL. Much of the questions directed to the GAL by the parties' trial counsel related to the numerous conflicts that had arisen, especially the conflicts between Wife and the GAL. The GAL felt that Wife instigated unnecessary disputes and created conflicts with Husband's allotted parenting time. On several occasions, the trial judge sought to redirect the GAL's testimony with statements such as, "Let's hone in on [Son]. I want to hear about [the GAL's] meetings with [Son], how he's doing now, what her recommendations are for the parenting plan." Ultimately, the GAL outlined her recommendations. The parenting plan recommended by the GAL at trial was much the same as that recommended in her September 2006 interim report.[18] The GAL indicated in her testimony that her proposed plan was acceptable to Husband. She said that Wife, however, felt that the GAL's proposed parenting plan allocated too much residential parenting time to Husband.

Husband testified on his own behalf. In his testimony, he discussed his marriage to Wife, the events precipitating his filing for divorce, his career and his ability to earn income, and the marital estate.

Husband recounted that he and Wife married in December 1993 and their son was born in March 1995. Early on, he said, the marriage was going "okay" until he made a "stupid mistake" by having an affair. After that, despite intensive couples therapy, Wife frequently had explosive rages in which she cursed, berated, and occasionally hit or slapped him. Husband asserted that these outbursts sometimes occurred in Son's presence, but Husband tolerated them out of guilt over his transgression. By the time the family moved to Memphis in 2001, Husband said, their relationship was a "shell of a marriage." Husband said that he occupied most of his time with work to avoid the constant "fighting, screaming, and yelling," but admitted that this approach had cost him a close relationship with Son. Husband claimed "complete surprise" that a particularly vicious argument in the morning of February 7, 2006 resulted in him suddenly leaving the house and filing for divorce. On cross-examination, however, Husband admitted that he had had several extramarital affairs, and in January 2006 had consulted with a divorce attorney.

Turning to his employment, Husband testified that he was still practicing at both MSPS and St. Francis. He explained that MSPS is basically an expense-sharing arrangement among the physician-owners, including himself. He was drawing a salary of $195,000 per year, payable in bi-weekly installments, with quarterly bonuses based on the collections of MSPS attributable to him. Due to the uneven cash flow, Husband said that he would often take out "bridge" loans between the bonus payments. Husband described a sixty-hour work-week

---

[18]At trial, the GAL recommended that Husband be designated primary residential parent during the summer.

over four days per week at MSPS; he said that he is on-call a few weeknights and about one weekend per month.

In 2001, Husband began doing "moonlighting" at St. Francis as an in-house critical care doctor, earning anywhere from $12,000 to $15,000 per month. Prior to the parties' separation, each month he would work two sixty-hour weekends and a few twelve-hour weeknight shifts at Saint Francis, in addition to his MSPS work. After the parties' separation and during the pendency of the case, Husband had residential parenting time with Son every other weekend. This affected the time available for him to do his moonlighting work at St. Francis. Husband said that, while the divorce had been pending, he had been able to work weekends at St. Francis only "about once every two or three months." Consequently, his income from St. Francis had diminished by about eighteen percent. In his trial testimony, Husband maintained that he had not worked any weekends at St. Francis during 2008; he had only worked weeknight shifts at St. Francis from 7 p.m. to 7 a.m., which made it "more difficult . . . to be alert" for his primary duties at MSPS. Husband claimed that, due to internal changes, St. Francis would no longer need his "moonlighting" services at all, at some point after January 2009.

The parties' tax returns were introduced into evidence during Husband's testimony. They showed that Husband earned total gross income of $506,715 in 2002 and $725,032 in 2003. Of these totals, $95,825 in 2002 and $253,695 in 2003 came from "moonlighting" at St. Francis. Around 2004, Husband became a partner at MSPS. After that, he earned total gross income of $935,081 in 2004, $895,255 in 2005, $910,982 in 2006, and $839,327 in 2007. During these years, the portion attributable to "moonlighting" at St. Francis was $236,855 in 2004, $215,080 in 2005, $177,028 in 2006, and $181,155 in 2007.

On cross-examination, three financial statements submitted by Husband to various financial institutions for loan applications were entered into evidence. The first financial statement was dated March 2004, on which Husband had handwritten the figure "$1,000,000" as his total annual income. In another loan application dated November 2005, Husband signed a financial statement indicating that he earned an income of one million dollars per year. In an October 2005 application for a loan to purchase a Steinway grand piano, Husband had represented that he earned a gross income of $90,000 per month, which annualized to over one million dollars a year.

Husband explained that the income representations in the financial statements for the loan applications were "guesstimate[s]" and "ballpark figure[s]." Husband insisted repeatedly that he had "never in [his] life made a million dollars or more." He added that "my tax returns speak for themselves on what I really make."

On further cross-examination on his moonlighting income, Husband acknowledged that he had "probably" testified to the divorce referee at the *pendente lite* support hearing that his employment with St. Francis would end in March 2006. Husband's counsel stipulated that Husband had consistently represented throughout the proceedings that his income would at some point be reduced because of impending changes at St. Francis. Husband said that he had looked into other moonlighting jobs but had not found one that fit his schedule, including his parenting schedule.

In his testimony, Husband also discussed the marital estate. In 2004, he and Wife purchased the Germantown house for about $1.35 million. There was apparently no down payment; the entire purchase price was financed with a 100% loan. By the time his motion to compel the sale of the house was heard, the appraised value had dropped to $950,000; however, $1.3 million remained owing on the mortgage. The trial court at that time ordered that the house be listed at $1.2 million. As a consequence, Husband said, the Germantown house never sold and remained part of the marital estate. At the time of trial, $1.2 million was owed on the mortgage, and Husband opined that the house at that point would sell for no more than $800,000. Other than his retirement accounts and his separate residence in Memphis,[19] Husband said, the marital estate was severely encumbered with debt, resulting in a net negative marital estate.

Wife testified as well. In her testimony, she discussed the parties' marriage, their abrupt separation, her relationship with the GAL, her work experience, and her income and finances.

When Husband suddenly left the marital home in February 2006 and filed for divorce, Wife testified, she was "shock[ed]." Although she and Husband occasionally argued, she characterized their marriage as normal "most of the time." She disagreed with Husband's assertion that they had a "shell of a marriage" in Memphis, calling this statement a "complete lie." In response to his allegation that she had frequent angry outbursts, Wife claimed that she was kind to Husband but expected a married man not to have girlfriends.

Wife described her relationship with the GAL over the course of the protracted divorce proceedings. At first, Wife said, she fully cooperated with the GAL and communicated directly with her. At some point, Wife felt, the GAL became "threatening," and Wife began communicating with the GAL solely through her attorneys. As things deteriorated, Wife said, the GAL threatened to address the trial court if Wife did not comply with her requests, to take away Wife's decision-making authority with regard to Son, and to have all of the

---

[19]Husband's pre-trial affidavit stated that his separate Memphis residence was worth $290,000 as of August 2007, with $280,000 owed on the mortgage.

GAL's fees assessed against Wife. Overall, Wife believed, the GAL sought to overrule her decisions as a mother. Without continued intrusion by the GAL, Wife claimed, she was capable of cooperating with Husband on parenting issues.[20]

Wife described her educational background, work history, and expenses. Prior to marrying Husband, Wife earned a college degree in economics and worked selling software for a computer company. At Husband's request, she left the workforce "way before" they married. During the marriage, she was a stay-at-home wife and mother who supported Husband's success in his medical career. Wife spent her time volunteering at Son's school, attending Bible study classes, and performing volunteer community service. Wife admitted that, since divorce proceedings were instituted, she had made no effort to re-enter the workforce or update her knowledge of computer software. Wife explained that she had been overwhelmed by the divorce process.

In her testimony, Wife adopted her Rule 14(c) affidavit of income and expenses, and advocated the positions set forth in her pretrial brief. In her pretrial brief, Wife took the position that selling the marital home in Germantown was not feasible, and so the home should be awarded to her, along with sufficient alimony *in futuro* to pay the monthly mortgage payment. In her Rule 14(c) affidavit, Wife said that her expenses at the time were $12,480 per month. This did not include some large expenses, such as the mortgage and upkeep on the marital home. If she were awarded the marital home, Wife noted, she would need sufficient alimony to pay the $8400 per month mortgage. Wife calculated that her expenses after the divorce would be $32,100 per month, including the sizeable mortgage payment, estimated income taxes of some $9,000 per month, and her other expenses; consequently, she sought an award of alimony *in futuro* of $30,000 per month.

Wife testified that, during the marriage, the parties had enjoyed a "good life-style," enjoying vacations to destinations such as Santa Domingo and taking a Disney cruise. Since the parties' separation, she claimed, she had scaled down her expenses, noting that she took Son on a vacation trip to Dollywood in east Tennessee. On cross-examination, however, she conceded that, since the separation, her vacation trips had also included destinations such as beach resorts in South Carolina, the Bahamas, and Florida, and a ski resort in Winter Park, Colorado.

At the conclusion of the proceedings, the trial court took the case under advisement.

---

[20]Wife was cross-examined by the AAL on Wife's criticism of the GAL. The questions did not appear to relate directly to the parenting decisions before the trial court.

## *Trial Court Decision*

In December 2008, the trial court entered a thirty-four page memorandum opinion and order that granted a divorce to Wife, adopted a parenting plan, divided the marital estate, and awarded alimony, child support, attorney fees, and discretionary costs to Wife.

At the outset of its opinion, the trial court capsulized the litigation:

> This case has been marred by multiple judges, multiple lawyers, and a regrettably hostile relationship between [Wife] and the [GAL]. That relationship was so strained that a prior judge found it necessary to appoint an attorney ad litem to represent the [GAL].
>
> * * *
>
> By most measures this case should not have dissolved into such contentiousness and concomitant expense. The parties had a long-term marriage and the plaintiff was a well-paid physician. His wife was able to devote herself to the home and their son. . . . The son was perhaps somewhat overprotected but otherwise a normal boy whose problems were no more than any child who has had to suffer through his parents' divorce. Just how this case was derailed into such malevolence and expense is contested by the parties. The wife blames the guardian ad litem and the husband. The husband blames the wife. The guardian ad litem contends that the problems rest mostly with [the wife]. The lawyers for both sides have contributed to this environment of animosity.
>
> The Court notes that the total cost of attorney's fees in this case for the parties' multiple and successive lawyers, guardian ad litem and attorney ad litem will be over $800,000, and perhaps as high as $1,000,000. Such cost is a mark of the failure of the legal system to effectively deal with and minimize the emotional and financial conflicts inherent in ending the parties' marriage.

The trial court commented on the "weighty" roles in the litigation of both the GAL and the AAL, contrary to the normally "circumspect role" of attorneys appointed for the benefit of a child in a custody dispute. It noted, however, that the issue of the fees for the GAL and the AAL had been reserved for later.

Utilizing the GAL's recommended parenting plan as a basic framework, the trial court adopted a parenting plan that incorporated many of the provisions of the temporary parenting plan that had been in effect since June 2007, with modifications to address the problems that had emerged. The parenting plan designated Wife as the primary residential parent, with

parenting time for Husband every other weekend plus Monday nights. The order directed the parties to agree on a mediator, and terminated the involvement of Son's therapist.

In dividing the parties' property, Judge Kurtz noted that the marital estate was not complicated, but the task of dividing it was rendered problematic by the $400,000 in negative equity in the Germantown house. After reviewing the parties' assets and liabilities, Husband was awarded the house and ordered to sell it and to take on the remaining associated debt. Pending the sale, Wife and Son were permitted to continue residing in the home, and Wife was awarded $40,000 in alimony *in solido* for a down payment on a new house. Husband's retirement accounts were divided evenly. Respective bank accounts, vehicles, and debts incurred other than attorney fees were allocated to each party. Husband was awarded his separate Memphis residence and his ownership interest in MSPS, which the trial court valued at $250,000.

After dividing the marital estate, the trial court considered Wife's request for alimony. The trial court found Wife to be economically disadvantaged and in need of support. The trial court observed that Wife is "an intelligent, educated, and articulate person," but noted she had not worked outside the home since 1993 and her knowledge in her field had become dated. It found that Wife could be rehabilitated to an extent, but concluded that "[s]he could not, . . . even if rehabilitated, achieve an earning capacity that would allow her a standard of living reasonably comparable to that enjoyed during the marriage or to [Husband's] post-divorce standard of living." The trial court commented that, prior to separation, the parties had enjoyed "quite a good lifestyle" and that Husband had continued to "live[] fairly well" after their separation. After reviewing the parties' accountings and Rule 14(c) statements of income and expenses, the trial court found Wife's statement of her current expenses as well as her estimate of her post-divorce expenses, to be "excessive." It also deemed Wife's accounting statements "difficult to follow" and "unreliable."

The trial court then discussed Husband's income and earning capacity:

> [Husband] has a gross annual income of around $850,000. This includes salary, bonuses, and second job. He is a highly-qualified physician with a substantial earning capacity. He now contends that his income may decrease because his "moonlighting" position may be curtailed or eliminated. The Court would note, however, that in the last several years he has filled out financial statements seeking loans where he stated his income was approximately $1,000,000.00. At trial [Husband] testified that the one-million annual income was an approximation and after all he was only seeking a loan. The Court assumes some validity to these estimates, as a knowing false

-16-

information on a financial statement would in many instances be a criminal offense. See, e.g., 18 U.S.C. § 1014.

Thus, the trial court considered Husband's predictions regarding his St. Francis "moonlighting" opportunities, the past income shown on his income tax returns, and the income representations on the loan applications entered into evidence, and concluded that Husband was capable of earning $850,000 per year. It acknowledged the problems created by the debt on the Germantown house, but found overall that the marital estate division would not overly burden Husband with debt.

In light of the above findings, the trial court then set Husband's support obligation. It awarded Wife rehabilitative alimony in the amount of $8000 per month for four years, and $5000 per month for the following two years. Additionally, Wife was awarded $8500 per month in alimony *in futuro* until her death or remarriage. Husband was also ordered to pay $2100 per month in child support, $1250 per month into a trust account for Son's college expenses, and Son's private school tuition.

The trial court turned to Wife's request for attorney fees. It commented: "Any neutral observer of legal proceedings would be appalled by the attorney's fees in this case." It recapped the attorney fees incurred *prior* to trial as totaling $369,697 for Husband and $308,953 for Wife.

In setting forth its reasoning on the award of attorney fees, the trial court specifically referenced the factors in Rule 1.5 of the Rules of Professional Conduct and cited ***Chaffin v. Ellis***, 211 S.W.3d 264, 290-93 (Tenn. Ct. App. 2006). It observed that "lawyers from **both** sides contribut[ed] to the aggravation between the parties rather than attempting to minimize conflict." (emphasis in original). The trial court specifically laid some of the blame on Wife for repeatedly terminating lawyers. Ultimately, the trial court found "significant blame to be shared by all," but noted that Wife's fault would "be reflected in the attorney's fees awarded." The trial court then awarded Wife $186,000 in attorney fees as alimony *in solido* and $15,000 in discretionary costs.[21]

After the trial court issued its memorandum opinion, a hearing was held on the assessment of the GAL and AAL fees. Both submitted affidavits of fees incurred in the case. From her appointment through the trial, the GAL fees totaled $160,127, with $99,448 remaining unpaid. Similarly, the AAL fees from appointment through the trial totaled $98,243, and $69,813 remained unpaid.

---

[21]Only $2500 in discretionary costs were awarded to Wife in the December 2008 order. Pursuant to Wife's post-trial motion, the trial court awarded an additional $12,500 in costs in a separate order.

In support of the fee request by the GAL and the AAL, they submitted the affidavit of an experienced Shelby County family law attorney, who explained that, based on the affiant's past experience, it was "routine" for the Shelby County trial courts to appoint a guardian ad litem in "a high-conflict case involving children and parenting issues." The affiant likewise characterized it as "routine" for the Shelby County trial courts to appoint an attorney ad litem "when the Court determines that either a child or a Guardian ad Litem is in need of same."

In the affidavit, the attorney stated that, based on past experience before the initial trial judge in this case, the initial trial judge would expect the guardian ad litem's duties to include the following:

F.     Failing full cooperation by the parties, to notify the Court of said failure in cooperation so that the problem can be addressed (typically through the appointment of an Attorney ad Litem), corrected, or sanctioned;

[G.]   For the GAL to work with the parties to effectuate better parenting and possible resolution, including having the GAL act as a quasi-mediator to assist in resolving practical issues of import such as education, health, visitation schedules, and extra-curricular activity schedules.

Similarly, the affiant expressed the opinion that the initial trial judge in this case would expect an attorney ad litem to perform duties that include the following:

A.     Extensive discussion with the GAL and any witness, including the child and the parties, that the AAL deems necessary;

B.     Failing full cooperation by the parties with the GAL, the issuance of discovery necessary to assist the GAL in obtaining information necessary for the GAL to carry out her court-ordered responsibilities;

C.     Failing a parties' [sic] compliance with discovery issued by the AAL, notification of the Court regarding said failure so that the problem could be addressed, corrected, or sanctioned;

D.     To assist the GAL in work with counsel for the parties to effectuate better parenting and possible resolution especially on practical issues of import such as education, health, visitation schedules, and extra-curricular activity schedules for the child, but also on matters such as discovery disputes and legal disagreements relevant to the child; and,

E.    To provide the GAL (and ultimately the child) with competent, experienced legal representation and protection.

The affiant expressed the opinion that the appointments of both the GAL and the AAL were appropriate and that the fees requested were reasonable and necessary. Judge Kurtz took the matter under advisement.

In March 2009, Judge Kurtz issued an order considering the matters raised in the fee request for the GAL and the AAL, as well as Wife's unresolved motions to remove the GAL and the AAL.[22] At the outset of the order, Judge Kurtz outlined the roles of a guardian ad litem and an attorney ad litem, as discussed in ***Toms v. Toms***, 209 S.W.3d 76 (Tenn. Ct. App. 2005).[23] Quoting ***Keisling v. Keisling***, 196 S.W.3d 703, 730 n.11 (Tenn. Ct. App. 2005), Judge Kurtz also discussed the discretion afforded to a guardian ad litem, and the problems that arise when a guardian ad litem "undertakes tasks or assumes a role that is overly-expansive, not useful, or otherwise inappropriate," citing as an example a situation in which a guardian ad

---

[22] Judge Kurtz explained that, by the time he was made aware of Wife's pending motion to remove the GAL and the AAL, it was so close to the scheduled trial date that there was little point in resolving the motion prior to trial.

[23] The ***Toms*** Court cited Professor Janet Richards' authoritative treatise on Tennessee family law:

> In her treatise, Professor Richards discusses the roles of a guardian ad litem and an attorney ad litem as follows:
>
> In a custody dispute, the attorney representing each of the competing adults must zealously represent the interests of that client. The interests of the adults are not always consistent with the best interests of the child. The court, however is empowered to appoint a representative for the child in the form of a guardian *ad litem* or an attorney *ad litem*. The guardian *ad litem* may be an attorney or a specially trained non-lawyer such as the Court-Appointed Special Advocates (CASA). The role of the guardian *ad litem*, whether attorney or non-attorney, should be the same – to protect the child's interest and to gather and present facts for the court's consideration. The role of the attorney *ad litem*, however, should be that of any other attorney – to represent and advocate the child's interests before the court, including the calling and cross-examining of witnesses, etc. The guardian *ad litem* may testify, the attorney *ad litem* should not. The guardian *ad litem* is guided by the child's best interest, irrespective of the child's wishes; the attorney *ad litem* should advocate the wishes of the client, assuming the child is sufficiently mature to make such a decision. Unfortunately, Tennessee does not have a statute that clarifies the different roles of the guardian *ad litem* and the attorney *ad litem*. Consequently, the roles have been blurred, especially when an attorney is appointed as a guardian *ad litem*.

***Toms***, 209 S.W.3d at 80-81 (quoting JANET L. RICHARDS, RICHARDS ON TENNESSEE FAMILY LAW § 8-7 (2d ed. 2004)).

litem "assumes the role of an arbitrator or special master of sorts, in effect determining the outcome of lesser disputes between the parties."

> Summarizing the law on such guardians, Judge Kurtz stated:
> None of the case law . . . gives the GAL authority to be a mediator, om[]budsman, special master or a mini judge. The GAL is only to protect the child's interest and gather and present sufficient facts for the court's consideration: nothing more or nothing less.

Commenting specifically on the affidavit opining on the common practices and expectations of the local trial courts and the initial trial judge, Judge Kurtz observed that it "speaks to an expectation which does not appear in any court order and expresses a role for the GAL and AAL beyond that authorized by the legal authorities." Judge Kurtz recognized that a local "legal culture ha[d] developed . . . in which the GALs have assumed authority beyond the parameters set forth in the case law," but added: "[W]hen push comes to shove the law must trump culture."

In the case at bar, the trial court openly questioned whether the appointment of a GAL had been necessary. It noted that the parties' son "was not a special needs child, was not abused, and had no problems outside of a normal teenager going through a divorce with bickering parents" and regardless of the animosity between the parents, "the custody/visitation decision in this case was not difficult" and "could have been just as appropriately resolved without input from a GAL and/or AAL." However, considering the "bickering" between the parties and the lawyers, and Wife's attempts "to thwart court orders," Judge Kurtz commented:

> Perhaps there was an unstated expectation that the GAL would arbitrate conflict and direct the parties so as to minimize conflicts. Instead of being a fact-finder, she became an active participant in the poisonous dynamic between the parties. She became a mini-judge, and her relationship with [Wife] was so strained that she had to procure her own attorney (the AAL), because for all practical purposes she became a third party to what was a two party divorce.

Judge Kurtz then made the following findings regarding the GAL:

> The GAL exceeded the scope of the appointment order and the role of the GAL set forth in case law. . . . The investigation conducted by the GAL far exceeded what was helpful to the Court. . . . Assuming that a GAL was necessary, this Court would have expected [only] a 5-10 page report . . ..

-20-

The even bigger problem was the involvement of the GAL as a mediator or om[]budsman throughout the pendency of this case. The time sheets as well as the testimony of the GAL, [Wife], and [Husband] tell a story of countless interventions and/or communications with the GAL over visitation disputes, counseling appointments, selection of counselors, and the like. . . . The role assumed by the GAL in this case was "beyond the purview of the traditional role of the guardian ad litem." [quoting *Keisling*, 196 S.W.3d at 730 n.11].

As to the AAL, Judge Kurtz made this finding:

The AAL assumed a role not contemplated by the law. There is no authority for a GAL in a divorce case to have a lawyer represent her in the trial court. The pleadings filed in this case clearly show that the AAL, after . . . appointment, represented the GAL. . . . [The AAL] did not perform the role contemplated for an AAL and there was no issue in this case that called for an AAL.

The trial court noted that it had no criticism of the GAL's "effort and . . . commitment to the child," and said that the AAL acted "in a highly professional manner in performing the role . . . assumed." It stated: "The issue is not whether they were both well-intended, but rather did they exceed the boundaries drawn by the law for their respective roles."

In view of these findings, the trial court awarded the GAL a fee of $7500, and awarded the AAL a fee of $5000, both assessed two-thirds to Husband and one-third to Wife.[24]

Husband now appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Husband argues that the trial court abused its discretion by awarding Wife substantial rehabilitative and *in futuro* alimony. He argues that the trial court (1) rejected Wife's statement of need and accounting as excessive and unreliable, but never determined what Wife's need actually was, (2) grossly overstated Husband's ability to pay, given the marital debt allocated to him, (3) did not sufficiently consider the relatively short length of the marriage, and (4) did not sufficiently consider Wife's good health, education and age. Husband also argues that the trial court abused its discretion in awarding Wife $186,000 in alimony *in solido* for attorney fees and $15,000 in discretionary costs, in light of (1) Wife's

---

[24]The GAL had already received a fee of $71,000, bringing her total fee to $78,500, and the AAL had already received a fee of $30,000, bringing the AAL's total fee to $35,000.

egregious litigation strategy and her contentious battle with the GAL, thus increasing attorney fees, and (2) the trial court's other property, alimony, and debt allocation.

Wife argues that the trial court's ruling should be affirmed, and she seeks an award of attorney fees on appeal.

Since this case was tried by the trial court sitting without a jury, we review the trial court's findings of fact *de novo* with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Hyneman v. Hyneman*, 152 S.W.3d 549, 553 (Tenn. Ct. App. 2003) (citing *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)). We afford "considerable deference" to the trial court's determinations of credibility and the weight given to oral testimony, "because the trial court has the opportunity to observe the witnesses' demeanor and hear the in-court testimony." *Interstate Mech. Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 678 (Tenn. 2007) (citing *Tobitt v. Bridgestone/Firestone, Inc.*, 59 S.W.3d 57, 61 (Tenn. 2001); *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. Workers Comp. Panel 1995)).

 "Determinations concerning the amount and duration of alimony are factually driven and require a balancing of the various factors contained" in Tennessee Code Annotated § 36-5-121(i).[25] *Dube v. Dube*, 104 S.W.3d 863, 868 (Tenn. Ct. App. 2002) (citing *Herrera v. Herrera*, 944 S.W.2d 379, 387-88 (Tenn. Ct. App. 1996)). In setting alimony, the trial court enjoys broad discretion. *Goodman v. Goodman*, 8 S.W.3d 289, 293 (Tenn. Ct. App. 1999) (citing *Jones v. Jones*, 784 S.W.2d 349, 352 (Tenn. Ct. App. 1989)). Consequently, the trial court's alimony decision will not be altered on appeal unless the trial court has "manifestly abused its discretion." *Id.* (citing *Ingram v. Ingram*, 721 S.W.2d 262, 264 (Tenn. Ct. App. 1986)).

An award of attorney fees and discretionary costs is likewise within the trial court's discretion and will not be altered on appeal unless the trial court has abused that discretion. *Tomanelli v. Tomanelli*, No. E2007-01864-COA-R3-CV, 2008 WL 2811316, at *6 (Tenn. Ct. App. July 22, 2008), *no perm. app.* (citing *Sanders v. Gray*, 989 S.W.2d 343, 345 (Tenn. Ct. App. 1998)) (discretionary costs); *Smith v. Smith*, 984 S.W.2d 606, 610 (Tenn. Ct. App. 1997) (citing *Storey v. Storey*, 835 S.W.2d 593, 597 (Tenn. Ct. App. 1992)) (attorney fees).

Under the abuse of discretion standard, the trial court's decision is affirmed "so long as reasonable minds can disagree as to propriety of the decision made." *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citing *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State*

---

[25]At the time the *Dube* opinion was filed, the pertinent factors were found at Tennessee Code Annotated § 36-5-101(d)(1). *See Dube*, 104 S.W.3d at 868.

*v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000)).  This Court is not permitted "to substitute its judgment for that of the trial court."  ***Id.*** (citing ***Myint v. Allstate Ins. Co.***, 970 S.W.2d 920, 927 (Tenn. 1998)).  The trial court may abuse its discretion by applying an incorrect legal standard or reaching a decision against logic or reasoning that causes an injustice to the complaining party.  ***Id.*** (quoting ***State v. Shirley***, 6 S.W.3d 243, 247 (Tenn. 1999)).

The decision to award attorney fees incurred on appeal lies solely within the discretion of the appellate court.[26]  ***Moses v. Moses***, No. E2008-00257-COA-R3-CV, 2009 WL 838105, at *10 (Tenn. Ct. App. Mar. 31, 2009), *no perm. app.* (citing ***Archer v. Archer***, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)).

#### ANALYSIS

### *Rehabilitative and In Futuro Alimony*

Husband argues that the trial court abused its discretion in its award to Wife of "substantial" rehabilitative and *in futuro* alimony.  After reviewing the proceedings at some length, Husband notes that, although the trial court criticized Wife's Rule 14(c) statement of her expected post-divorce expenses as "excessive," it "never determined what her need actually was," but instead went straight to making its award of alimony.  Husband argues that, because the need of the obligee spouse is of primary importance in alimony decisions, the trial court must establish the amount of Wife's need in order to set the amount of support.  In support, Husband cites ***Aaron v. Aaron***, 909 S.W.2d 408, 410 (Tenn. 1995) ("[T]he real need of the spouse seeking the support is the single most important factor."); ***Burnett v. Burnett***, No. W2007-00038-COA-R3-CV, 2008 WL 727579, at *17-19 (Tenn. Ct. App. Mar. 19, 2008) (remanding for trial court to establish the wife's expenses and recalculate alimony); ***Jekot v. Jekot***, 232 S.W.3d 744, 752 (Tenn. Ct. App. 2007) (noting that award of alimony must be commensurate with demonstrated need).

Husband argues as well that, in evaluating Husband's ability to pay support, the trial court erred in finding that he will be able to maintain an income of $850,000 per year.  He notes first that Husband's average income, from his tax returns for six years, was $784,000 per year, not $850,000 per year.[27]  He notes, too, that for Husband to continue earning at that

---

[26]If the appellate court makes an award of attorney fees incurred on appeal, the cause is remanded to the trial court for a determination of the amount of the fees, because such a determination may require an evidentiary hearing.

[27]In arriving at an average of $784,000 per year for six years, Husband focuses solely on his income from MSPS and St. Francis.  The parties' tax returns list the following gross income amounts, which include, *inter*

(continued...)

level would require him to continue "moonlighting" at St. Francis. Husband argues that the "moonlighting" income will not continue because (1) his job at St. Francis is to be eliminated because of a staff change, (2) his every-other-weekend residential parenting time with Son makes it impossible, and (3) at the time of trial, Husband was 49 years old and the working hours required for such a schedule are too exhausting at his age and interfere with his primary duties at MSPS.

Husband also argues that the alimony obligation set by the trial court was excessive in light of the amount of debt allocated to him in the property division. Husband contends that he was allocated $1.39 million in marital debt, with few offsetting assets. He notes that, although the trial court placed a $250,000 value on his medical practice, he cannot use that value to pay his obligations.

Finally, Husband contends that the alimony obligation is excessive in light of the length of the marriage and Wife's health, age, and educational level. With the amount of alimony awarded, he argues, Wife will "lack[] any motivation to seek self-sufficiency, making [Husband] in effect her indentured servant." Overall, Husband contends, this Court should either reverse the award of alimony, modify it downward, or remand for the trial court to make a finding as to the dollar amount of Wife's actual need.

In general, "[t]he purpose of spousal support is to aid the disadvantaged spouse to become and remain self-sufficient and, when economic rehabilitation is not feasible, to mitigate the harsh economic realities of divorce." *Owens v. Owens*, 241 S.W.3d 478, 493-94 (Tenn. Ct. App. 2007) (citing *Earls v. Earls*, 42 S.W.3d 877, 888 (Tenn. Ct. App. 2000)). Four types of spousal support are recognized in Tennessee: alimony *in futuro*, alimony *in solido*, rehabilitative alimony, and transitional alimony. *See* T.C.A. § 36-5-121(d)(1) (2005); *Owens*, 241 S.W.3d at 493. There is a statutory preference for the award of rehabilitative alimony. *See* T.C.A. § 36-5-121(d)(1), (d)(2) (2005).

Rehabilitative alimony is intended to assist the disadvantaged spouse in achieving economic rehabilitation after the divorce. *See Owens*, 241 S.W.3d at 493 n.13. Under Tennessee Code Annotated § 36-5-121(d)(2) and (e)(1), the term "rehabilitation" means that, with reasonable efforts, the disadvantaged spouse will be able to achieve "an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably

---

[27](...continued)
*alia*, capital gains, interest, and other income: $506,715 (2002); $725,032 (2003); $935,081 (2004); $895,255 (2005); $910,982 (2006); and $839,327 (2007). The average of these figures is $802,065 per year. We note that the trial court apparently used Husband's average income over a four-year period rather than a six-year period.

comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse." T.C.A. § 36-5-121(d)(2), (e)(1) (2005); *accord Wiser v. Wiser*, No. M2009-00620-COA-R3-CV, 2010 WL 2553652, at \*11-12 (Tenn. Ct. App. June 25, 2010). An award of rehabilitative alimony may correspond with the disadvantaged spouse's acquisition of additional education or training. *See Owens*, 241 S.W.3d at 493 n.13.

Alimony *in futuro* is long-term periodic spousal support, typically payable until the death or remarriage of the obligee spouse. T.C.A. § 36-5-121(f)(1) (2005). An award of alimony *in futuro* is appropriate when the trial court finds "that there is relative economic disadvantage and that rehabilitation is not feasible." *Id.* An award of alimony *in futuro* concurrent with an award of rehabilitative alimony may be appropriate when the trial court finds that the economically disadvantaged spouse "may be only partially rehabilitated." T.C.A. § 36-5-121(d)(4) (2005).

"There are no hard and fast rules for spousal support decisions." *Owens*, 241 S.W.3d at 493 (citing *Manis v. Manis*, 49 S.W.3d 295, 304 (Tenn. Ct. App. 2001); *Anderton v. Anderton*, 988 S.W.2d 675, 682 (Tenn. Ct. App. 1998); *Crain v. Crain*, 925 S.W.2d 232, 233 (Tenn. Ct. App.1996)). In determining the propriety of a spousal support award as well as the nature, amount and length of any such award, the trial court balances the factors codified at Tennessee Code Annotated § 36-5-121(i).[28] *See Dube*,104 S.W.3d at 868 (citing *Herrera*,

---

[28]Tennessee Code Annotated § 36-5-121(i) list the following factors to be considered:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such partys earnings capacity to a reasonable level;
> (3) The duration of the marriage;
> (4) The age and mental condition of each party;
> (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
> (6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
> (7) The separate assets of each party, both real and personal, tangible and intangible;
> (8) The provisions made with regard to the marital property, as defined in § 36-4-121;
> (9) The standard of living of the parties established during the marriage;
> (10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(continued...)

944 S.W.2d at 387-88). In general, the two most important factors are the need of the economically disadvantaged spouse and the obligor's ability to pay. *Bratton v. Bratton*, 136 S.W.3d 595, 604 (Tenn. 2004) (citing *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001)).

As Husband rightly notes, in this case, there was ample justification for the trial court's conclusion that Wife's statement of expenses was excessive. Her alimony request of $30,000 per month was likewise excessive. And Husband is correct in observing that, while the trial court discounted Wife's accounting and her statement of expenses, it did not make a specific finding of the amount of Wife's need.

However, while the cases cited by Husband discuss the disadvantaged spouse's need with varying degrees of specificity, none hold that the trial court must make a precise "dollar amount" finding of the obligee spouse's need before it can make an award of alimony. Moreover, the total alimony award in this case, including rehabilitative alimony, is $16,500 per month, about half of Wife's "excessive" expense estimate, and in the long term, when the rehabilitative alimony evaporates, the *in futuro* award of $8500 per month is about a quarter of her expense estimate. Under these circumstances, the trial court's failure to make a finding on the specific amount of Wife's need does not in and of itself render the alimony award an abuse of discretion.

Reviewing the evidence pertinent to Husband's ability to earn income, we must conclude that the trial court's finding was derived in part from its assessment of Husband's credibility. The tax returns entered into evidence show that, in the four years prior to the trial, Husband earned an average gross income of $895,161 per year, with a significant percentage coming from Husband's "moonlighting" at St. Francis. Husband points to his testimony at trial that he would soon be losing his "moonlighting" income, but he also acknowledged in his testimony that he had consistently represented throughout the years of divorce proceedings that his income from St. Francis would soon be reduced or eliminated. Moreover, the trial court considered not one, but three financial statements in which Husband represented that he earned $1 million or more per year. "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings." *Woodward v. Woodward*, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery*

---

[28](...continued)

> (11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
> (12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

T.C.A. § 36-5-121(i) (2005).

***Mfg. Co.***, 984 S.W.2d 912, 915 (Tenn. 1999)). We acknowledge that for Husband to continue earning at the same level will no doubt require him to continue his brutal work schedule, at least for the next several years. However, the appellate court is not permitted to substitute its judgment for that of the trial court. ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001) (citing ***Myint v. Allstate Ins. Co.***, 970 S.W.2d 920, 927 (Tenn. 1998)). Having carefully reviewed the record, and with appropriate deference to the trial court's assessment of Husband's credibility, we cannot conclude that the evidence preponderates against the finding that Husband can maintain an income of $850,000 per year.

Husband argues that his ability to pay is materially hampered by the debt allocated to him in the trial court's division of the marital estate. In setting Husband's spousal support obligation, the trial court stated expressly that it was aware of the ramifications of the division of the marital estate property, including the marital debt. It said: "The Court does recognize that not only does [Husband] now carry a lot of debt but that he will, of necessity, be the one who must be given responsibility for the substantial negative equity on the marital home." We recognize as well that the debt is daunting, and that the parties accumulated little in the way of assets to offset the substantial debt. However, with Husband earning $850,000 per year, despite the size of the overall debt, we cannot conclude that the trial court erred in concluding that the amount of support awarded was not "more than [Husband] can pay."

Beyond challenging the trial court's analysis of Wife's need and his ability to pay, Husband argues that analysis of the statutory factors shows that the trial court erred in its award. He argues that the parties were married only twelve years,[29] that Wife was fifty-one at the time of trial, in good health, educated, and experienced in the workforce, and that Son is an adolescent in good health. He contends that this case lacks the long marriage, ill or disabled spouse, or young child "ordinarily . . . needed to justify alimony in futuro."

We perceive that Husband is in effect arguing that Wife does not need alimony because she can be fully rehabilitated. If so, we must note that Husband proffered no evidence to support a finding that Wife can be rehabilitated to a level that would permit her to achieve an earning capacity sufficient to support a standard of living comparable to either the standard enjoyed during the parties' marriage or Husband's post-divorce standard. ***See*** T.C.A. § 36-5-121(e)(1); ***see also Osborne v. Osborne***, 1986 WL 9567, at *2 (Tenn. Ct. App. Sept. 2, 1986) (concluding that husband did not meet burden of proving rehabilitation was feasible). It is undisputed that Wife became a full-time homemaker almost as soon as the parties married, if not before, and remained as such for the duration of their marriage, with Husband's agreement. From our review of the record, we find that the evidence fully supports the trial

---

[29]In his principle brief, Husband takes the position that the parties' marriage ended with the filing of his complaint for divorce in 2006.

court's finding that Wife can be rehabilitated to an extent, but she will never "achieve an earning capacity that would allow her a standard of living reasonably comparable to that enjoyed during the marriage or to [Husband's] post-divorce standard of living." A concurrent award of alimony *in futuro* and rehabilitative alimony, such as that made in this case, is appropriate when "a spouse may be only partially rehabilitated." T.C.A. § 36-5-121(d)(4) (2005).

In reviewing an alimony award, the role of the appellate court is to "determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." **Owens**, 241 S.W.3d at 493 (citing **Bogan v. Bogan**, 60 S.W.3d 721, 733 (Tenn. 2001)). Again, the appellate court is not to substitute its judgment for that of the trial court. **Eldridge**, 42 S.W.3d at 85 (citing **Myint**, 970 S.W.2d at 927). After a careful review of the evidence in the record, we must conclude that the trial court applied the correct legal standard and that the alimony award does not constitute an abuse of the trial court's discretion.

### *Attorney Fees and Discretionary Costs*

Husband argues that the trial court abused its discretion in awarding Wife $186,000 in attorney fees as alimony *in solido* and $15,000 in discretionary costs. Citing **Goodman v. Goodman**, 8 S.W.3d 289 (Tenn. Ct. App. 1999), he asserts that the trial court improperly awarded alimony *in solido* out of his future earnings rather than his share of the marital estate.

Husband also contends that the amount of the award of attorney fees to Wife was an abuse of discretion, given Wife's "egregious" litigation strategy. He cites an injunction against Wife issued early in the litigation, prohibiting Wife from contacting Husband's work colleagues to make derogatory comments about Husband. He argues that her monetary demands were excessive and unreasonable throughout the litigation, and her changes in lawyers and efforts to obtain the recusal of the initial trial judge resulted in delays which in turn resulted in increased attorney fees for both parties.

Husband contends as well that Wife's "long war against the GAL, and later the AAL, unreasonably escalated the legal expenses in this case." He contends that, after Wife's first attorney agreed to the appointment of the GAL, Wife "subsequently attacked the GAL and her integrity and professionalism so strongly that the trial court had to appoint an attorney ad litem to represent the GAL." Husband observes that he and his attorneys "were often spectators to the battle between [Wife] and her counsel with the GAL and AAL, and with [Husband] sometimes as an unwilling participant."

-28-

Husband points out that the trial court in its memorandum opinion specifically faulted Wife's litigation strategy, noting her failure to cooperate with the GAL after initially agreeing to the GAL's appointment. He acknowledges that the trial court did not award Wife all of the attorney fees she sought, but argues that her fees were not cut nearly enough to discourage such litigation tactics. He argues that this Court should require Wife "to pay the full freight for her own fees."

We note that the *Goodman* case, cited by Husband, cites *Aleshire v. Aleshire*, 642 S.W.2d 729 (Tenn. Ct. App. 1981), for the proposition that alimony *in solido* should be awarded out of a spouse's share of the marital estate and not from anticipated future earnings. *See Goodman*, 8 S.W.3d at 297. *Aleshire* cites a Tennessee statute as authority. *See Aleshire*, 642 S.W.2d at 733 ("T.C.A. § 36-821 provides for alimony *in solido* to be paid out of the present estate of the spouse and does not, in our opinion, contemplate the consideration of an expectation of earnings as a part of that present estate."). However, the statute cited in *Aleshire* has since has been amended, and no longer has language so limiting an award of alimony *in solido*. *See* T.C.A. § 36-5-121(h)(1) (2005).

The trial court's decision to award attorney fees as alimony *in solido*, as with any other award of alimony, is reviewed on appeal under an abuse of discretion standard. *See Mathias v. Mathias*, No. E2006-02294-COA-R3-CV, 2008 WL 539227, at *12 (Tenn. Ct. App. Feb. 28, 2008), *no perm. app.* (citing *Sandlin v. Sandlin*, No. M2003-00775-COA-R3-CV, 2004 WL 1237273, at *5 (Tenn. Ct. App. June 3, 2004), *no perm. app.*). Likewise, the award of discretionary costs is reviewed under an abuse of discretion standard. *Tomanelli v. Tomanelli*, No. E2007-01864-COA-R3-CV, 2008 WL 2811316, at *6 (Tenn. Ct. App. July 22, 2008), *no perm. app.* (citing *Sanders v. Gray*, 989 S.W.2d 343, 345 (Tenn. Ct. App. 1998)). A party's decision to engage in litigation tactics calculated to produce delay and increase costs is a factor to be considered in connection with an award of attorney fees. *See, e.g., Hall v. Hall*, No. E2007-02564-COA-R3-CV, 2008 WL 4613961, at *1 (Tenn. Ct. App. Oct. 15, 2008), *no perm. app.* (citing *Bauer v. Bauer*, No. M2001-00266-COA-R3-CV, 2002 WL 256802, at *2 (Tenn. Ct. App. Feb. 22, 2002), *no perm. app.*; *Long v. Long*, 957 S.W.2d 825, 829 (Tenn. Ct. App. 1997); *Gilliam v. Gilliam*, 776 S.W.2d 81, 86-87 (Tenn. Ct. App. 1988)) (upholding assessment of attorney fees against the husband because of his litigation tactics).

Husband's arguments regarding Wife's litigation choices are not without merit. Early in the litigation, Wife adopted a pugnacious posture *vis-a-vis* a GAL who was acting at the behest of the court. It cannot be said that either Wife or her attorneys sought to minimize conflict. Her financial positions were consistently excessive and she resisted compromise on even minor parenting issues.

Nevertheless, in reviewing the award of attorney fees, we are obliged to take a "bird's eye" view of the litigation as a whole. In awarding attorney fees and discretionary costs to Wife, the trial court correctly noted that the delay in the case was caused by "both happenstance and intent." Although Wife changed attorneys more, both parties in fact changed attorneys during the case, and the trial court found that the attorneys on both sides had created pretrial disputes, filed overly-long, unnecessary pleadings, and overall "contributed to this environment of animosity." The record supports this finding. Moreover, we cannot ignore Husband's choice upon filing the divorce complaint to lock Wife out of access to the parties' marital funds, a tactic that set a combative tone for the litigation at the outset.

The factors that appear to set this case apart from most divorce litigation relate to the GAL and the AAL. The trial court observed: "This case is . . . unique because of the weighty involvement of the guardian ad litem and then the attorney ad litem. The Court purposely uses the word 'weighty.'" This view is reflected in Judge Kurtz's extensive findings relating to the GAL and the AAL.

As noted in the memorandum opinion, although the order appointing the GAL stipulates to the elimination of most expected objections to the trial testimony of the GAL or to her report, it does not indicate that the GAL was expected to assume the role of a parenting mediator or, in Judge Kurtz's words, a "mini-judge." The order appointing the AAL likewise does not specify any role other than the traditional role of an attorney ad litem, namely, "to represent and advocate the child's interests before the court," *Toms v. Toms*, 209 S.W.3d 76, 81 (Tenn. Ct. App. 2005) (quoting JANET L. RICHARDS, RICHARDS ON TENNESSEE FAMILY LAW § 8-7 (2d ed. 2004)), except insofar as the order states generally that the AAL is appointed "for any purpose." The record indicates, however, that the GAL and the AAL, both experienced, ethical, and respected family law attorneys, assumed these roles in accordance with unstated but widely-understood expectations by local trial judges in general and by the initial appointing trial judge in particular.[30] Judge Kurtz clearly credited this explanation, finding

---

[30]At the hearing on the fees of the GAL and the AAL, Husband's trial counsel corroborated the explanation of the GAL and the AAL for their roles in the litigation. Describing the evolution in the local culture over many years, Husband's attorney cited typical parenting disputes that arise in divorce cases, which become moot by the time a hearing before the trial judge can be held, then stated:

> What's the best thing for the kid? Well, if you've got somebody in the middle like a Guardian ad Litem, they can simply say, you people need to stop doing this. . . . [B]ecause if you don't stop doing this, I'm going to make a report to the Judge and that's not going to help you. . . . [I]f you don't change your behavior, then the other party is going to take you to Court and I'm going to be called upon to testify and I'm going to say something ugly about you and then you're going to lose your kid.

(continued...)

-30-

a local "legal culture" in which both guardians ad litem and attorneys ad litem would take on such roles.

We are obliged to view the record in its entirety, and in particular to consider the overall effect of the unusual roles of the GAL and the AAL. Judge Kurtz considered the proceedings that preceded his appointment, and then viewed the parties, their attorneys, and the GAL and AAL in the proceedings before him. After analyzing the caselaw on guardians ad litem and attorneys ad litem, he issued extensive findings and conclusions of law on the authority of the GAL and the AAL to act in these expanded, or non-traditional, capacities. From our review of the record and the caselaw and other authorities, we do not disagree with either his factual findings or his conclusions of law.[31]

To the point in this appeal, however well-intended the GAL and the AAL may have been, their continuing "weighty" involvement in the parties' parenting issues contributed significantly to the overall amount of attorney fees generated, not simply their own fees.[32] The blurred role of the GAL[33] appeared to create confusion as to what the GAL's function

---

[30](...continued)
> . . . [T]hat's why people like [the GAL] provide a benefit, both to the Courts and to the parties . . . . [T]hat's the way things have worked down here.

[31] See Rule 40A of the Rules of the Supreme Court of the State of Tennessee (Appointment of Guardians ad Litem in Custody Proceedings), a provisional rule that became effective on May 1, 2009, after the trial court proceedings in this case. By order entered on April 30, 2010, the provisional rule will remain in effect through December 31, 2010.

[32] Judge Kurtz's decision to award relatively little further fees to the GAL and the AAL, for their good faith attempt to fulfill the expectations of the trial judges as they understood them, was not appealed. *See Keisling v. Keisling*, 196 S.W.3d 703, 725-31 (Tenn. Ct. App. 2005) (discussing appeal by guardian ad litem of fee award, where original trial judge who had appointed guardian had recused).

[33] The *A.B.A. Standards*, referenced by the initial trial judge in the order appointing the GAL, eschew the use of the term "guardian ad litem" in favor of "Best Interests Attorney" and "Child's Attorney." The commentary to the *Standards* explains:

> These Standards do not use the term "Guardian Ad Litem." The role of "guardian ad litem" has become too muddled . . .. It is a venerable legal concept that has often been stretched beyond recognition to serve fundamentally new functions, such as parenting coordinator, referee, facilitator, arbitrator, evaluator, mediator and advocate. Asking one Guardian Ad Litem to perform several roles at once, to be all things to all people, is a messy, ineffective expedient.

(continued...)

was,[34] and other problems as well.[35]  The parties to the divorce and their lawyers were obliged to react and respond not only to each other, but also to the actions of the GAL and/or the AAL.  We are constrained to note as well that Judge Kurtz's findings and conclusions of law about the GAL and the AAL make it more difficult to fault Wife for her persistent questioning of the continued presence of the GAL in the divorce proceedings.  Thus, no one party can be blamed for an aggregate of attorney fees that is indeed "appall[ing]."

We recognize that the award of attorney fees to Wife is very substantial, particularly in light of her contribution to the unnecessary contentiousness of the litigation.  We are not at liberty, however, to substitute our judgment for that of the trial judge.  ***Eldridge v. Eldridge***, 42

---

[33](...continued)
A.B.A. Standards, *supra*, § 2 cmt.  The Introduction to the *A.B.A. Standards* states that a purpose of their adoption was to build public confidence in a just and fair court system by ensuring that "all participants in a case know the duties, powers and limitations of the appointed role."  A.B.A. Standards, *supra*, § 1.

[34]At one point, as the GAL testified about her "day-long" meetings with Wife, her lawyers, and the Son's therapist to mediate parenting disputes, Wife's attorney objected to the GAL's testimony based on Rule 408 of the Tennessee Rules of Evidence, excluding evidence related to settlement or compromise negotiations. The trial judge overruled it, adding: "I certainly don't think the conversation of the guardian ad litem falls under 408."  However, evidence of "conduct or statements made in the course of Rule 31 ADR Proceedings" is inadmissible.  TENN. R. SUP. CT. 31, § 7 (referencing Rule 408).

[35]After her interim recommendation that Wife be designated as the primary residential parent, the GAL testified that it had been "very difficult" for her to continue recommending to the trial court that Wife be designated as the primary residential parent "despite all of the attacks, all the slander, all the innuendos, all the indications that complaints were being filed against me, . . . and what was still going on . . . for two and-a-half years."  She testified:

> I think the easier thing would have been to say you don't [re]ward a parent for bad behavior and that it's not going to stop unless you did something drastic like change your recommendation from primary residential parental status to be awarded to dad.

The GAL stated that "[t]he only thing that stopped me" from changing her recommendation to the Court to recommend that Husband be designated as the primary residential parent was the intervention of Son's therapist, who stressed to the GAL that, in light of the close bond between mother and son, if Husband were designated as the primary residential parent, "all hell could break loose with the child."  In light of this, the GAL said, her recommendation remained for the court to designate Wife as the primary residential parent. Of course, any guardian ad litem may be subject to attack by a divorcing parent who disagrees with the guardian ad litem's recommendation to the court.  However, a continuing role by the guardian ad litem as mediator or parenting facilitator would appear to increase the likelihood that the unhappy parent may infer that difficulties between the parent and the guardian ad litem, not directly related to parenting, could affect the guardian's recommendation to the court on parenting or custody issues.  *See supra* n.30.

-32-

S.W.3d 82, 85 (Tenn. 2001) (citing *Myint v. Allstate Ins. Co.*, 970 S.W.3d 920, 927 (Tenn. 1998)). Judge Kurtz stated in his well-done opinion that, in coming to a decision on the parties' financial matters, including the award of attorney fees, he took into consideration all of the "statutory factors and . . . the parties' income, expenses, substantial debts, prior lifestyle, rehabilitation potential, [and] division of marital property." From our review of all of these factors, and of the record as a whole, the balance struck by Judge Kurtz in awarding wife $186,000 of the $302,714 in attorney fees she requested, and in awarding her $15,000 of the $64,786 in discretionary costs that she requested, is within the range of reasonableness. Under all of these circumstances, we cannot conclude that the trial court abused its discretion in its award to Wife of attorney fees and of discretionary costs.

In her appellate brief, Wife requests attorney fees incurred on appeal. After considering this request, we respectfully decline to award Wife attorney fees on appeal.

## CONCLUSION

The decision of the trial court is affirmed. The costs of this appeal are taxed to the Appellant James McKay Andrews, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE