# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 15, 2014 Session

## JOSHUA WAYNE TAYLOR v. MARY KATHERINE TAYLOR

**Appeal from the Circuit Court for Hamilton County**
**No. 10D1752     Jacqueline S. Bolton, Judge**

_____

### No. E2013-01734-COA-R3-CV-FILED-JULY 30, 2014

_____

This is a post-divorce case stemming from the parties' competing pleadings, both of which sought (1) a modification of their earlier-filed agreed permanent parenting plan as well as (2) other relief. Within a few months of their divorce, Mary Katherine Taylor ("Mother") had filed a petition to modify the residential parenting schedule. Joshua Wayne Taylor ("Father") filed a counterclaim also seeking a modified residential schedule and, furthermore, a change in the custody designation. Following a bench trial, the court found that there was no material change in circumstances warranting a change in the identity of the primary residential parent, but that there was a material change supporting a modification of the residential schedule. The court ordered a new schedule that substantially increased Mother's parenting time and provided Father with only standard visitation. The court dismissed each party's attempt to find the other in contempt. Father appeals. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

Jennifer K. Peck, Chattanooga, Tennessee, for the appellant, Joshua Wayne Taylor.

Sandra J. Bott, Chattanooga, Tennessee, for the appellee, Mary Katherine Taylor.

# OPINION

## I.

Mother and Father were married in August 2008. A daughter ("the Child") was born to their union in March 2009. Mother and Father separated in September 2010. At that time, they agreed to a permanent parenting plan setting forth their rights and responsibilities with respect to the Child. Around November 2010, Father reunited with an old college girlfriend over the internet.

On January 19, 2011, the parties were granted a divorce, and their agreed parenting plan was incorporated into the divorce decree. Under the plan, Mother was designated as the primary residential parent, and Father was ordered to pay child support. The plan allocated a total of 183 parenting days to Mother, and 182 days to Father. The day-to-day schedule provided Father with parenting time "**every other** weekend from Saturday at 8:00 a.m. until Monday at 8:00 a.m. or as otherwise agreed upon and **every** Monday and Tuesday from 8:00 a.m. to Wednesday at 8:00 a.m." (Bold font in original.) Father was also granted "26 days of vacation to be agreed upon." According to Mother, this was to "make the days even, [and] to lessen the child support." Father disagreed with Mother's explanation. He explained that it was a method of allowing him to use his vacation time to spend time with the Child. Most holidays and other special days were evenly divided. The plan provided for joint decision-making of all major issues.

A month after the divorce became final, Father married his girlfriend, and they moved into a new house. Father's new wife had two young children of her own and was pregnant with Father's child. Mother learned of Father's remarriage and, according to Father, was "absolutely livid."

In April 2011, Mother initiated the instant litigation when she filed a petition to modify the parenting plan and sought a restraining order. Mother alleged that a material change in circumstances had occurred since the parenting plan was established. She submitted it was in the Child's best interest to modify the residential schedule. Mother alleged that Father had twice refused to return the Child to her according to their schedule and that he regularly took the Child to Nashville so Father's mother could care for the Child during his parenting time. The court granted Mother a temporary restraining order prohibiting Father from removing the Child from Hamilton County during the pendency of the action, and enjoining Father's overnight visitation pending mediation. The order also required Father to timely return the Child to Mother. An agreed order to the same general effect – requiring both parties to abide by the parenting plan schedule and to obtain the other party's permission to remove the Child from the county – soon followed.

In June 2011, Father filed his answer together with a counterclaim for modification and for contempt. Father agreed that a material change in circumstances had occurred and alleged "that said change warrants a change in the residential schedule, as well as a change in the primary residential parent designation." In support of his petition, Father alleged that Mother did not provide a safe environment for the Child in that both the live-in maternal grandmother, who frequently cared for the Child, and Mother's son,[1] had a history of drug and alcohol abuse. Father further alleged that Mother harassed him and used the Child "as a weapon to retaliate against him." In support of his contempt petition, Father averred that Mother had willfully violated provisions of the parenting plan and should be "punished accordingly." In March 2012, Mother subsequently amended her petition so as to specify, with regard to a material change in circumstances, that the current residential schedule was "too demanding for such a young child" and that Father's "living situation has materially changed. . . ." Mother also sought a contempt finding against Father and a modified child support order. In April 2012, Father filed another petition for contempt – this petition sought to punish Mother for taking the Child out of town without his permission and for denying him parenting time in violation of the parties' agreed plan.

The parties attended mediation on July 5, 2011; it proved unsuccessful. In August 2011, an agreed order was entered allowing Father to travel to Nashville with the Child for one day, and to utilize some of his allocated "vacation" days with the Child during his family's annual week-long trip to the beach.

A bench trial was held on the parties' competing pleadings for modification and other matters. It was held over two days in September 2012 and March 2013. Mother testified that she was the Child's primary caregiver during the marriage because Father worked long hours with rotating shifts. Mother said that, when Father wasn't working or sleeping, he had "minimal interaction" with the Child. The Child's maternal grandmother, Ms. McGee, moved in to help the parties just before the Child was born and remained in the home and helped care for the Child throughout the marriage and thereafter. Father testified with respect to his allegations that the Child was not safe at Mother's home because Ms. McGee abused her prescription medication – an allegation that Mother and Ms. McGee denied.

Much of the testimony focused on the difficulties the parties had experienced with the residential schedule. They had exchanged literally thousands of text messages, many of which revolved around changes to the agreed schedule and related issues. Mother testified that they found "right off the bat" that trying to drop off or pick up the Child at 8:00 a.m. would not work. As a result, at first, there was some cooperation and flexibility between the

---

[1]Mother's teenage son from a previous relationship lived with the parties during the marriage and was continuing to live with Mother at the time of trial.

parties in their exchanges of the Child. Father testified, however, that Mother would revert back to a strict, 8:00 a.m. time for the exchange whenever she was angry with him. Mother responded that Father would consistently send her text messages trying to change the agreed schedule to accommodate his work or other interests, often with little notice. Father conceded that once the Child was with him, he would ask Mother to let the Child stay longer in an effort to use some of his additional "vacation" days. Mother countered that Father had not often requested to use his vacation days until after she filed her petition to modify the schedule. She admitted she had declined at least one request because she and the Child already had plans. Mother testified that Father would continue to text her multiple times a day "if he didn't get his way." Mother admitted she had made requests to change the schedule, but contended that she usually did so in an effort to accommodate Father's work schedule. Mother believed a more traditional visitation arrangement would be best for the Child. She said Father invariably took the Child to Nashville so his mother could care for her while he worked. Father testified this was not his regular practice, but it had happened on occasions.

At the time of trial, Mother, 35, worked as a social worker earning $38,700 a year. Father, 34, had been a railroad engineer for the past 14 years. During the marriage and leading up to the trial, Father often worked second shift, from 4:00 p.m. until 4:00 a.m. with some travel. Father had top seniority at his work place. Around April 2012, he elected to start working the "extra board" whereby he was on call six days a week but assigned to no regular shifts. He earned a base salary of some $57,000 a year even if he was never called in to work. He testified he currently worked an average of two days a week and the length of his shifts varied. He said they could last up to twelve hours. He testified that most of the time, he was aware weeks in advance of when he would be called into work. In the months before trial, Father was off for much of his scheduled time with the Child. If he were called in to work, his wife was a stay-at-home mother and could care for the Child. Father was on track to earn roughly $80,000 in 2012.

Asked for any evidence he had that the Child had suffered any harm or mistreatment in Mother's care, Father pointed only to a rash around the Child's mouth that was purportedly the result of using a pacifier. Father objected to the Child being in "daycare." He preferred that she be a little older and wait until after the court case concluded to start preschool; he believed it was "critical" that children be home with their parents during the early years. On further examination, Father could not recall why he insisted, during the parties' marriage, that Mother return to work before the Child was a year old. For her part, Mother emphasized that the Child was bright and attended a preschool program two days a week where she enjoyed learning and socializing with other children. Mother wanted the Child to attend three days a week, but Father would not allow it during his time on Mondays and Tuesdays. She cited

the Child's attendance at school as another reason the residential schedule should be modified.

At the time of trial, Mother continued to live in the former marital home with the Child, her other son, and Ms. McGee. Father lived with his new wife and three young children in their new home and regularly exercised parenting time with the Child. Both parties submitted proposed parenting plans which included a residential schedule that provided the other parent with standard visitation every other weekend and one night a week during alternating weeks.

At the close of the proof, the trial court granted Mother's petition to modify the visitation schedule. The court otherwise denied the parties' requests for relief. In support of its decision, the court found that "[t]here has been absolutely no material change of circumstances to warrant a change of custody from [M]other to [F]ather, . . . there has not been any that affects the [C]hild's wellbeing in any meaningful way." At the same time, the court found that it had "become evident that the visitation schedule is a hardship for this three-year-old child." The court decreed, in the words of the order, as follows:

> 1. Mother's Petition for Modification is granted. Mother's Petition for Contempt is denied. Father's Petition for Modification and Contempt is denied.
>
> 2. Mother shall remain the primary residential parent.
>
> 3. Father's visitation shall be from Friday at 6:00 p.m. until Sunday at 6:00 p.m. on alternating weekends. Also, on the alternating week, Father shall have the child from Wednesday at 4:00 p.m. to 7:00 p.m.
>
> 4. Father is responsible for transportation of the child.
>
> 5. Child support shall be based on . . . ($33,000.00) per year for Mother and . . . ($77,000.00) for Father, and said child support calculation shall include the cost of childcare.
>
> 6. Mother and Father shall alternate the tax deduction for the minor child each year.

A modified permanent parenting plan was entered consistent with the court's order. The court denied Mother's ensuing motions to alter or amend the judgment and for an award of

her attorney's fees.  Costs were taxed equally between the parties.  Father filed a timely notice of appeal.

II.

Father states his issues as follows:

> The trial court erred in finding that a material change in circumstances had not occurred.
>
> The trial court erred in failing to designate [Father] as the Primary Residential Parent.
>
> The trial court erred in failing to hold [Mother] in willful contempt of court.

Mother raises the following issues:

> The trial court did err in deviating from the Child Support Guidelines without a written explanation by failing to award [Mother] the dependency exemption for the minor child and failing to provide that extraordinary medical and dental expenses for the minor child be paid on a pro rata income sharing basis.
>
> The trial court did err in failing to award [Mother] her reasonable attorney's fees pursuant to Tenn. Code Ann. § 36-5-103(c) for prevailing at the trial level.

Mother further seeks an award of her reasonable attorney's fees in defending this appeal.

III.

Our review is de novo; however, the record of the proceedings below comes to us with a presumption that the trial court's findings are correct.  We must honor this presumption "unless the preponderance of the evidence is otherwise." Rule 13(d), T.R.A.P.; ***Hass v. Knighton***, 676 S.W.2d 554, 555 (Tenn. 1984).  There is no presumption of correctness with respect to the trial court's legal conclusions, ***Taylor v. Fezell***, 158 S.W.3d 352, 357 (Tenn. 2005), or with respect to its application of the law to the facts. ***State v. Thacker***, 164 S.W.3d 208, 247-48 (Tenn. 2005).

-6-

"Trial courts are vested with broad discretion in matters of divorce and child custody, and appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Whitaker v. Whitaker*, 957 S.W.2d 834, 836-37 (Tenn. Ct. App. 1997)(citing *Mimms v. Mimms*, 780 S.W.2d 739, 744-45 (Tenn. Ct. App. 1989)). The court's discretion extends to framing parenting plans and choosing primary residential parents. *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999). We review these determinations under an abuse of discretion standard whereby a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

"Where the issue for decision depends upon the determination of the credibility of witnesses, the trial court is the best judge of the credibility and its findings of credibility are entitled to great weight. This is true because the trial court alone has the opportunity to observe the appearance and the demeanor of the witnesses." *Tenn-Tex Properties v. Brownell Electro*., 778 S.W.2d 423, 426 (Tenn. 1989).

IV.

A.

In his first two issues, Father asserts that he successfully demonstrated a material change in circumstances that warrants a change in the designation of the primary residential parent. He submits that he should be made the Child's primary custodian based on Mother's alleged "overall failure to abide by the terms of the Permanent Parenting Plan" and his own "ability to parent the child almost fulltime due to his work schedule." Within his argument, Father also objects to his decreased parenting time under the modified residential schedule. In this section, we address both of these issues.

"Decisions involving the custody of a child are among the most important decisions faced by the Courts." *In re Kaitlyn M.W. v. Crystal D.S.P.,* No. W2010-00301-COA-R3-CV, 2010 WL 5541054 at *5 (Tenn. Ct. App. W.S., filed Dec. 28, 2010) (citing *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001)). "When faced with a request to modify custody, courts generally favor the existing custody arrangement, on the premise that children tend to thrive in a stable environment." *Id*. (citing *Aaby v. Strange*, 924 S.W.2d 623, 627 (Tenn. 1996)).

This Court has repeatedly recognized that a child custody determination – once made and implemented – is res judicata upon the facts in existence or those that were reasonably

foreseeable when the decision was made. ***Rigsby v. Edmonds,*** 395 S.W.3d 728, 735 (Tenn. Ct. App. 2012); ***Steen***, 61 S.W.3d at 327; ***Austin v. Gray***, No. M2013-00708-COA-R3-CV, 2013 WL 6729799 at *3 (Tenn. Ct. App. M.S., filed Dec. 18, 2013). At the same time, the courts may modify an award of child custody as "intervening changes in circumstances" and the "exigencies of the case may require." ***Adelsperger v. Adelsperger***, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). A party seeking a change in custody must prove two things – that a material change in circumstances has occurred and that a change of custody is in the best interest of the child. ***Kendrick v. Shoemake***, 90 S.W.3d 566, 568 (Tenn. 2002). We have observed that the "determination of whether a 'material change in circumstance' occurred requires a different standard depending upon whether a parent is seeking to modify custody (i.e., change the primary residential parent) or modify the residential parenting schedule." ***Dickerson v. Cantrell***, No. E2013-01732-COA-R3-CV, 2014 WL 2086636 at *6 (Tenn. Ct. App. E.S., filed May 14, 2014); ***Armbrister v. Armbrister***, 414 S.W.3d 685, (Tenn. 2013). To that end, Tenn. Code Ann. § 36-6-101 addresses both types of modifications, in relevant part, as follows:

> If the issue before the court is a modification of the court's prior decree *pertaining to custody*, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.
>
> \* \* \*
>
> If the issue before the court is a modification of the court's prior decree *pertaining to a residential parenting schedule*, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other

circumstances making a change in the residential parenting time in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(B), (C) (emphasis added).

B.

Father complains of the trial court's determination that he failed to prove that a change in circumstances exists such as to warrant a change of custody. We quote pertinent portions of the challenged order:

> [T]he Court finds that there has not been a material change of circumstances that affects the wellbeing of the child in any meaningful way that would warrant a change of custody from Mother to Father. The Court further finds that there has been a material change that should warrant the visitation schedule be affected. [. . . .]. The Court finds that Mother may put in a motion for attorney's fees to be considered. The Court is not making a finding of Contempt on either side. The Court finds that issues that were not addressed in the previous Permanent Parenting Plan, such as the cost of daycare, medical and dental expenses, life insurance, and the tax deduction, should be reflected on the current Permanent Parenting Plan and Child Support Worksheet.

As the party seeking a change in designation, Father had the burden of proving a material change in circumstances. With respect to this "threshold issue," this Court has observed:

> Although there are no bright-line rules for determining when such a change has occurred, there are several relevant considerations: (1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way. *Cranston*, 106 S.W.3d at 644 (citing *Kendrick*, 90 S.W.3d at 570; *Blair v. Badenhope*, 77 S.W. 3d 137, 150 (Tenn. 2002)).

*Austin v. Gray*, 2013 WL 6729799 at * 4.

At trial, Father's proof was directed at establishing that Mother had shown a "blatant disregard" for the terms of the parenting plan by, allegedly, refusing to make the Child available for Father's parenting time; failing to notify him of the Child's doctor's appointments; making unilateral childcare decisions; and demanding that Father provide all transportation for the Child. Father further sought to prove that he was available and best able to serve as the Child's primary caregiver and that it was in the Child's best interest for him to be designated as her primary custodian.

At trial, as to Mother's alleged refusal to abide by the terms of the parenting plan, Father claimed there were two times when Mother did not have the Child available at his parenting time; on the second occasion, Father was waiting at the daycare when Mother brought her some 30 minutes late. At the same time, Father agreed that the Child was returned to Mother nearly 12 hours late on one occasion when he had taken her to his mother's home in Nashville while he worked. The proof showed that Father had received some of his vacation days with the Child. At other times, Mother had not agreed to Father's desire to extend his parenting time, said requests often coming on short notice. Father testified that Mother "sometimes" advised him of the Child's upcoming doctor's appointments, but estimated there were three or four times when she failed to do so.

As to his new work schedule, Father admitted that he had the option to work the "extra board" as far back as 2010, well prior to the time the parties fashioned the agreed parenting plan. He said at that time, however, he was focused on working more and earning as much money as possible. Father added that he did not think it was fair that he always transported the Child considering it was 50 miles round trip between his home and Mother's.

In further testimony, Father alleged that, throughout the parties' marriage, Ms. McGee had a history of abusing her prescription medication. He said the practice continued after the parties separated. He admitted that his concerns about Ms. McGee existed even before the parties agreed to the parenting plan, which made Mother the primary custodian. Nevertheless, he allowed Ms. McGee to continue caring for the Child on a regular basis. Father took the position that the situation had changed since the divorce because he was not present to "monitor things" and claimed the Child had been put in daycare because Ms. McGee had been "sick," meaning she was abusing her medication. Father conceded he had no proof of drug abuse by anyone who was around the Child since the divorce. He was unable to offer evidence that the Child had ever suffered harm or mistreatment while in Mother's custody other than the aforesaid rash.

In denying Father's petition to change the custody designation, the trial court essentially rejected outright Father's efforts to show that, in this case, either a lack of compliance on Mother's part with aspects of the parenting plan, his own increased

availability to parent the Child, or any other asserted "changes" in circumstances since the divorce rose to the level of a material change sufficient to support a change in designation. Following our review of the record, we cannot say that the evidence preponderates against the trial court's determination. On reviewing an earlier custody modification case that presented similar allegations, we ultimately concluded: "While Mother's conduct has not always been laudable, we do not think that the evidence preponderates against the trial court's finding that these incidents do not rise to a level of a material change [in] circumstances warranting the drastic remedy of a change of custody." *Connell v. Connell*, C/A No. 03A01-9808-CV-00282, 2000 WL 122204 at *6 (Tenn. Ct. App. E.S., filed Jan. 25, 2000). We think the same holds true in the present case. To be sure, Mother did not react well to the news of the new life Father had embarked upon in his new home with his new wife and their child, and was not particularly cooperative nor pleasant in her communications with Father for a time. We are mindful, however, that "not all changes in the circumstances of the parties and the child warrant a change in custody." *Cosner v. Cosner*, No. E2007-02031-COA-R3-CV, 2008 WL 3892024, at *4 (Tenn. Ct. App. E.S., filed Aug. 22, 2008).

In short, the proof at trial fails to establish that any of the changes in circumstance since the divorce are *material* changes – that is, changes that affect the Child's well-being in a meaningful way. "It necessarily follows that if no material change in circumstances has been proven, the trial court 'is not required to make a best interests determination and must deny the request for a change of custody.' " *Rigsby*, 395 S.W.3d at 736 (quoting *Caudill v. Foley*, 21 S.W.3d 203, 213 (Tenn. Ct. App. 1999)). The trial court did not err in denying Father's counterclaim for modification with respect to a change of custodial designation.

C.

We now turn to the court's decision to modify the residential parenting schedule. While finding no basis for a change in custody, the trial court found that "it has become evident that the visitation schedule is a hardship for this three-year-old child." Father does not challenge the court's decision to modify the schedule, but he does take serious issue with the *manner* in which it was modified.

For purposes of modification of the residential parenting schedule, the petitioner has the burden to prove by a preponderance of the evidence a material change of circumstance. Again, this "may include, but is not limited to, significant changes in the needs of the child over time . . . failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child." Tenn. Code Ann. § 36-6-101(a)(2)(C). This Court has observed that "the statute regarding changes to a residential parenting schedule 'sets a very low threshold for establishing a material change

-11-

of circumstances. Indeed, *merely showing that the existing arrangement has proven unworkable for the parties is sufficient to satisfy the material change of circumstances test.*' " **Taylor v. Knott,** No. M2012-00172-COA-R3-JV, 2012 WL6449981 at *2 (Tenn. Ct. App. M.S., filed Dec. 12, 2012)(quoting **Rose v. Lashlee**, M2005-00361-COA-R3-CV, 2006 WL 2390980, at *3 n.3 (Tenn. Ct. App. Aug. 18, 2006)) (emphasis added).

The proof generally showed that, at times, the parties were flexible with each other concerning the residential schedule. Even in his pleading, Father alleged that "the parties had been flexible in the parenting time, allowing for extended times and concessions for either party. . . ." Their level of cooperation varied, however, and the parties could not seem to consistently follow the agreed parenting schedule and could not agree regarding Father's exercise of his "vacation days" with the Child. New plans were seemingly arranged on an almost daily, even hourly basis. In their competing pleadings to modify, both parties assert that the existing residential schedule was unworkable and required modification. The trial court agreed, and the evidence supports this conclusion.

Obviously, both parties love the Child and want to spend more time with her; the parenting schedule they entered into, however, proved problematic and difficult for all concerned. The Child, then three, had apparent difficulty with being so frequently exchanged between Mother and Father. There was testimony from both sides that the Child suffered with chronic constipation and bronchitis and was frequently sick. Mother testified the Child was "exhausted" and suffered from separation anxiety. Mother's sister, Kelly McGhee, offered similar observations. She testified [the Child] was "very tired" on returning from Father's home and had once fallen asleep on the doormat. Also, the Child was "very clingy" to Mother. The sister stated: "I think driving her back and forth takes a toll on [the Child]. It's not that she doesn't want to be with her dad, but she doesn't want to leave [Mother]." Father agreed that the current schedule was difficult for the Child, but proposed that she spend more time with him. He testified "She needs stability. She needs a regular home. She needs to be right here with her dad." He added he had worked hard to be in a position that allowed him to be home with his family. "That time is here, and I want to do that now." Father added that he had to "break [the Child's] heart twice a week" by returning her to Mother when she wanted to stay with him.

In our view, the evidence presents a picture of two parents who struggled to comply with the schedule they had imposed on themselves in an effort to have equal time with the Child. As the trial court put it, "[y]ou all are probably poster children for who I wish would go before the legislature and talk to them about what happens when you try to divide a child in half, especially a young child." The end result was a tired, often sick child, and parents who had grown frustrated with the schedule and each other's apparent inability or unwillingness to accommodate the other's need or desire for more flexibility in the parenting

-12-

arrangement. The parties returned to the court after their own efforts to equally divide the parenting time had failed. The court put in place a "standard" visitation schedule that gave Father parenting time every other weekend and one weeknight in the alternating weeks plus certain vacation days, holidays, and other special days with the Child. We have already concluded that the evidence supports the trial court's determination that there has been no material change in circumstances to support a change in custody; hence, Mother remains the primary residential parent. Given Mother's role as the primary caregiver, the trial court reasonably ordered an increase in Mother's parenting time under the day-to-day schedule. While this meant a corresponding decrease in Father's parenting days, Father was additionally granted specific parenting time during holiday and vacation periods and for two weeks each summer.

In modifying the residential schedule, the trial court did not articulate its analysis of the applicable statutory factors in Tenn. Code Ann. § 36-6-404(b) implicated by the evidence presented at trial. The court simply determined that "there has been a material change that should warrant the visitation schedule be affected" – more specifically, the existing residential schedule is "a hardship" for the Child. When a trial court fails to make specific findings of fact with regard to the relevant statutory factors, this Court must review the evidence in the record de novo to determine where the preponderance of the evidence lies. *Holmes v. Holmes*, No. E2013-01301-COA-R3-CV, 2013 WL 408464 at * 9 (Tenn. Ct. App. E.S., filed Feb. 3, 2014).

Again, "determining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge.'" *Armbrister*, 414 S.W.3d at 693 (quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)). Accordingly, a "trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion." *Id*. On our review, we conclude that the trial court's decision is within "the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Id*. (quoting *Eldridge*, 42 S.W.3d at 88). Accordingly, the trial court's modification of the permanent parenting plan with respect to the residential schedule is affirmed.

V.

Father contends that the trial court erred in failing to find Mother in contempt of court. He insists that Mother's repeated, willful violations of the parenting plan and court orders constitute contemptuous conduct that warrants appropriate punishment.

In the trial court, both parties petitioned the court to hold the other in contempt. First, in his June 2011 counterclaim, Father contended that Mother had willfully violated the

court's order. More specifically, Father alleged that Mother had made derogatory comments about him in the Child's presence, discouraged his relationship with the Child, made decisions concerning the Child without consulting him, and failed to allow him at least two telephone conversations a week with the then two-year-old Child, all contrary to the parenting plan provisions of the divorce decree. Father moved the court to find Mother "in contempt of court for her willful violation of the Final Decree of Divorce and . . . punished accordingly." In April 2012, Father filed a second contempt petition in which he asserted that Mother took the Child on a two-day trip to Atlanta in violation of the earlier restraining order that prohibited the Child's removal from Hamilton County without the express permission of the other party. Father also asserted that Mother had denied his residential parenting time. Father requested that Mother be held in "contempt of Court and criminal contempt of Court for her willful violation of this Court's Order . . . and punished accordingly, including a term in the workhouse." The parties' contempt motions were heard at trial. The trial court summarily denied both petitions. In its bench ruling, the court stated: "The findings of contempt – well, I probably could find [sic] findings of contempt on both sides, but I'm not making a formal finding on either side."

"This Court has observed that '[t]he threshold issue in every appeal from a finding of contempt is whether the contempt is civil or criminal.' " *Sprague v. Sprague*, E2012-01133-COA-R3-CV, 2013 WL 3148278 at *5 (Tenn. Ct. App. E.S., filed June 18, 2013)(internal citations omitted)(quoting *Jones v. Jones*, 01A01-9607-CV-00346, 1997 WL 80029 at *2 (Tenn. Ct. App. M.S., filed Feb. 26, 1997)). Again, Father petitioned the court to find Mother in "contempt of Court and criminal contempt of Court" for her alleged, willful violations of the parenting plan. Before this Court, he generically asserts that the "trial court erred in failing to find [Mother] in contempt." In denying relief, the trial court did not specify how it construed the petition. We briefly address the distinction between civil and criminal contempt:

> A court can imprison an individual to compel performance of a court order. This is typically referred to as "civil contempt." This remedy is available only when the individual has the ability to comply with the order at the time of the contempt hearing. Thus, with civil contempt, the one in contempt has the "keys to the jail" and can purge the contempt by complying with the court's order. In civil contempt, the imprisonment is meted out for the benefit of a party litigant.

> A court can also imprison and/or fine an individual simply as punishment for the contempt. This remedy is commonly referred to as "criminal contempt." Unless otherwise provided, the

-14-

circuit, chancery, and appellate courts are limited to imposing a fine of $ 50.00 and to imprisoning an individual for not more than ten days. A party who is in criminal contempt cannot be freed by eventual compliance.

*Ahern v. Ahern*, 15 S.W.3d 73, 79 (Tenn. 2000). The Supreme Court has "cautioned that criminal contempt charges should be used sparingly." *Sprague*, 2013 WL3148278 at *5.

In the present case, we read the petition as one for criminal contempt that sought to punish Mother for her alleged past transgressions. In addition to the differing remedies called into play, the Supreme Court has emphasized that it is necessary to distinguish between criminal and civil contempt in analyzing the right to appeal under our rules of appellate procedure. *See Overnite Transp. Co. v. Teamsters Local Union No. 480*, 172 S.W.3d 507, 510 (Tenn. 2005). In *Overnite Transportation Company*, the High Court elaborated on the distinction as follows:

If a defendant is charged with criminal contempt, guilt must be established by proof beyond a reasonable doubt. Criminal contempt cases are subject to the double jeopardy provisions in the federal and state constitutions. Thus, *an appeal from an acquittal of criminal contempt is barred*.

\* \* \*

The safeguards afforded to one accused of criminal contempt are not available to one accused of civil contempt. Tennessee Rule of Appellate Procedure 3(a) governs the right to appeal a trial court's order declining to hold an alleged contemnor in civil contempt in a civil case. Rule 3(a) provides that "in civil actions every final judgment entered by a trial court from which an appeal lies to the Supreme Court or Court of Appeals is appealable as of right." Rule 3(a) does not exclude civil contempt proceedings from an appeal as of right, and we can discern no reason to impose such restriction.

*Id*. (emphasis added). Thus, the Court held that – contrary to an acquittal in a criminal contempt case– "a right to appeal lies from a trial court's refusal to hold an alleged contemnor in civil contempt." *Id*. at 512.

Both of the parties treat this issue as pertaining to *criminal* contempt. However, it is not clear to us as to how the trial court characterized this issue, *i.e.*, whether Father was seeking a finding of *criminal* contempt or *civil* contempt. If the trial court treated the matter as criminal contempt, it is clear that the court's failure to make such a finding is not appealable and, therefore, not properly before us. If, on the other hand, this is a case of *civil* contempt, the evidence does not preponderate against the trial court's decision not to find Mother in contempt of court. Either way, there is no error on the subject of contempt.

VI.

A.

Mother contends that the trial court erroneously deviated from the Child Support Guidelines without a written explanation. In particular, she complains that the court failed (1) to award Mother the federal income tax dependency exemption for the Child every year and (2) to provide that the Child's uninsured medical and dental expenses should be allocated between the parties on a pro rata income-sharing basis rather than divided equally. We address these contentions in turn.

B.

Regarding taxes, the agreed parenting plan provided that Mother would claim the federal income tax exemption, and Father could claim it in alternating years provided that his child support payments were current as of January 15 of the year when the tax return is due. The modified plan ordered by the trial court provides that the federal income tax exemption for the Child shall be claimed by Mother in even years, and Father in odd years. As a consequence of the trial court's action, both the parties' initial agreed plan and the trial court's final word on this subject provide that the parties will share the tax exemption.[2]

Recently, this Court rejected a parent's assertion that it was error for the trial court to divide the tax exemptions for the children in question rather than to award all of the exemptions to the parent receiving child support. We stated:

> The "Taxation Assumption" in the schedule assumptions in the
> guidelines states in pertinent part: "The alternate residential

---

[2]The trial court's modified plan is contained in a pre-printed form. The provision in the modified plan addressing the alternating treatment of the tax exemption is typed into the form. This specific and inserted language trumps printed language on the form, *i.e.*, that the Guidelines "assume that the parent receiving the child support will get the tax exemption."

parent will file as a single wage earner claiming one withholding allowance, and the primary residential parent claims the tax exemptions for the child." Tenn. R. & Reg. 1240-02-04-.03(6)(b)(2)(ii). Mother contends Tenn. R. & Reg. 1240-02-04-.03(6)(b)(2) operates as a legal standard and, thus, the trial court erred in failing to allocate both tax exemptions to her. We respectfully disagree noting that our courts have held this "rule" is not obligatory on the trial courts. Tenn. R. & Reg. 1240-02-04-.03(6)(b)(2) "simply describes the methodology used to compute spouses' respective net incomes," and it is merely a mathematical assumption with no bearing on the trial court's discretion to award the tax exemptions. Accordingly, the rule did not require the allocation of both tax exemptions to Mother; thus, we find no error with the trial court not allocating both tax exemptions to Mother.

*Blankenship v. Cox*, No. M2013-00807-COA-R3-CV, 2014 WL1572706 at *15 (Tenn. Ct. App. M.S., filed April 17, 2014)(additional internal citations omitted).

In the present case, we reach the same result. The trial court in its modified parenting plan basically allocated the tax exemption as the parties had in their agreed plan – that is, the exemption was allocated between the parties in alternating years. Consistent with our reasoning in *Blankenship*, we conclude that no error results. This issue is without merit.

C.

The court's modified plan provides that Father will maintain health and dental insurance for the Child if reasonably available. In addition, the court ordered that any "[u]ncovered reasonable and necessary health, dental, orthodontic, vision and other medical expenses, which may include but are not limited to, deductibles or co-payments, . . . shall be split equally by Mother and Father." Mother essentially contends that the Guidelines mandate that all uninsured medical expenses must be divided between the parents based upon their respective incomes.

Tenn. Comp. R. & Regs. ch. 1240-2-4-.04(8), in addressing how child support awards are determined, discusses uninsured medical expenses, as follows:

The child's uninsured medical expenses including, but not limited to, deductibles, co-pays, dental, orthodontic, counseling, psychiatric, vision, hearing and other medical needs not covered

-17-

by insurance are not included in the basic child support schedule and shall be the financial responsibility of both parents.

\*     \*     \*

If uninsured medical expenses are not routinely incurred so that a specific monthly amount cannot be reasonably established, a specific dollar amount shall not be added to the basic child support obligation but the court order shall specify that these expenses shall be paid by the parents as incurred according to each parent's percentage of income *unless some other division is specifically ordered by the tribunal.*

Tenn. Comp. R. & Regs. R. 1240-2-4-.04(8)(d)(1, 2)(emphasis added).

Again, Mother seems to take the position that, under the Guidelines, all uninsured medical expenses must be allocated between parents based upon their respective incomes and that the trial court must explain any "deviation" from the Guidelines. We reject this reasoning.

The amount of child support for which the obligor parent is responsible is determined by applying the rules and calculations provided under the Guidelines. The Guidelines require that any "[d]eviations from this amount must be supported by written findings in the support order. . . ." Tenn. Comp. R. & Regs. R. 1240-2-4-.04(11)(a),(b); see also Tenn. Comp. R. & Regs. R. 1240-2-4-.07(1)(c) ("When ordering a deviation from the presumptive amount of child support established by the Guidelines, the tribunal's order shall contain written findings of fact. . . .").

It is clear to us that the Guidelines authorize the trial court to do exactly what it did. The precise language of the Guidelines on this subject provides that uninsured medical expenses "shall be paid by the parents as incurred according to each parent's percentage of income *unless some other division is specifically ordered by the tribunal.*" Tenn. Comp. R. & Regs. R. 1240-2-4-.04(8)(d)(3). Here, the court chose to allocate such expenses equally between Mother and Father. In line with the reasoning in ***Blankenship,*** as discussed above, we conclude that the trial court's allocation of the Child's "[u]ncovered reasonable and necessary health, dental, orthodontic, vision and other medical expenses. . ." was well within the language quoted directly above. The trial court did not deviate from the Guidelines; it followed them. There is no error in the trial court's action.

## VII.

Mother contends that the trial court erred in refusing to grant her request for an award of just over $18,000 in payment of attorney's fees incurred at the trial court level. Mother points to Tenn. Code Ann. § 36-5-103(c) which addresses attorney fee awards in custody cases, among others, as follows:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

The record reflects that the court invited Mother to file a motion for attorney's fees for its consideration, which Mother did. Father responded in opposition. After hearing the matter, the court declined to award attorney's fees, and ordered the parties to equally divide the court costs. The statute expressly provides that an award of attorney fees by the trial court is not mandatory, but discretionary. We conclude the court acted within its discretion in declining Mother's request.

## VIII.

Lastly, we consider Mother's request that she be awarded fees for her attorney's services on this appeal. "The decision to award attorney fees incurred on appeal lies solely within the discretion of the appellate court." *Andrews v. Andrews*, 344 S.W.3d 321, 341 (Tenn. App. 2010)(citing *Moses v. Moses*, No. E2008-00257-COA-R3-CV, 2009 WL 838105, at *10 (Tenn. Ct. App. Mar. 31, 2009)). In the present case, we likewise decline to exercise our discretion to award fees. Mother's request for an award of her attorney's fees on this appeal is hereby denied.

## IX.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Joshua Wayne Taylor. This case is remanded, pursuant to applicable law, for enforcement of the trial court's judgment and for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE