# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
August 18, 2016 Session

## DINAH BOSTIC NORMAN v. JOHN ARTHUR NORMAN IV

**Appeal from the Chancery Court for Williamson County**
**No. 43349     James G. Martin III, Chancellor**
———————————————————

**No. M2015-02364-COA-R3-CV – Filed August 28, 2017**
———————————————————

This case arises out of the demise of a long-term marriage. The trial court declared the parties divorced, equitably divided the marital estate, and awarded the wife alimony in solido, rehabilitative alimony, and alimony in futuro. On appeal, the husband raises many issues, including whether the doctrine of unclean hands should bar wife from receiving an award of alimony in solido, whether the court's division of the marital estate was inequitable, and whether the court's alimony awards were based on a clearly erroneous assessment of the evidence. Finding no abuse of discretion, we affirm the trial court's decision in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY J. BENNETT and RICHARD H. DINKINS, JJ., joined.

Robert E. Lee Davies, Franklin, Tennessee, (on appeal only) for the appellant, John Arthur Norman IV.

Lorraine Wade, Nashville, Tennessee, (on appeal only) for the appellee, Dinah Bostic Norman.

## OPINION

## I.

### A. PRETRIAL PROCEEDINGS

On July 15, 2014, Dinah Bostic Norman ("Wife") filed a complaint for absolute divorce from John Arthur Norman IV ("Husband") in the Chancery Court for Williamson County, Tennessee. The parties had been married for twenty-two years, and since 2006 had jointly owned and operated A-Z DME, LLC ("A-Z"), a durable medical equipment company.

In addition to her request for an absolute divorce, Wife sought an ex parte restraining order. She alleged that Husband had verbally abused and threatened her during the marriage, acted inappropriately at A-Z's business offices, and misappropriated company funds. Wife asked the court to prohibit Husband from having any contact with her pending a final hearing and from "coming about" A-Z, contacting any employees, accessing any business records or accounts, or otherwise interfering with Wife's operation of A-Z.

Based on Wife's sworn allegations, on July 16, 2014, the court issued the requested temporary restraining order. After an August 12, 2014 hearing, the court modified the restraining order to allow Husband to return to the marital residence and granted Husband limited access to A-Z.[1]

A-Z was the couple's most valuable marital asset and their sole source of income. After hearing testimony from both parties, the court imposed strict requirements on the use of funds generated by the business pending a final hearing. The court ordered Wife to transfer sufficient funds from the business to the parties' joint checking account to pay their respective household bills and prohibited any other withdrawals from the account. Each party was also directed to maintain separate checking accounts for personal expenses, and Wife was ordered to transfer $5,000 per month from the business to those accounts.

After a second hearing, the court dissolved the restraining order. Beginning September 29, 2014, the court ordered a return to the parties' traditional roles in the company but required them to alternate the days that they were physically present in the local office. The court left in place the previously ordered restrictions on the use of

---

[1] The court allowed Husband remote access to the financial books and records of the business and ordered Wife to share all business emails and text messages.

marital funds.

But the parties were unable or unwilling to work together. In December, each spouse asked the court to exclude the other from the business based on allegations of misconduct. After a hearing, on December 19, 2014, the court issued an order excluding Wife from A-Z and placing Husband solely in charge of business operations. The court ordered Husband to be transparent in operating the business operation and to share copies of all business information with Wife. The court ordered Wife to provide an accounting of all funds removed from the business and prohibited her from receiving any additional funds until the accounting was provided. Husband was allowed to withdraw $5,000 per month from the business for personal expenses. The court also ordered the parties to sell the marital residence.[2]

## B. EVIDENCE PRODUCED AT TRIAL

The court held a four-day trial, beginning on July 13, 2015. At the outset, the parties stipulated to the value of their marital assets and the total amount of funds A-Z had distributed to each party in 2014.

### 1. History of A-Z

At the time of the hearing, Wife was 44 and Husband was 49. Both parties were in good physical and mental health. They had two adult sons. Originally from Texas, the family moved to Tennessee in 2006. Shortly thereafter, they formed A-Z, with each spouse having a 50% ownership interest.

Initially, A-Z sold durable medical supplies from a small office space in Nashville. In 2008, Wife became interested in soliciting contracts from the Veterans Administration. She discovered that the federal government, through the Small Business Administration, operates a business development program to assist eligible small disadvantaged businesses in competing for federal government contracts. *See* 13 C.F.R. § 124.1 (2017). Wife decided to apply for 8(a) certification,[3] which would enable A-Z to participate in the business development program and compete for federal contracts that are set aside for

---

[2] Before trial, the marital residence was sold, and the sales proceeds were deposited with the Clerk and Master.

[3] Participation in the 8(a) business development program is limited to "small business[es] which [are] unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of and residing in the United States, and which demonstrate[] potential for success." 13 C.F.R. § 124.101. Once certified, a participant may only remain in the 8(a) program for nine years. *Id.* § 124.2. At the end of the nine year period, the business is presumed to have the "ability to compete in the marketplace without assistance." *Id.* § 124.302(a)(1).

3

small businesses.[4]   To qualify for the program, the parties modified their respective ownership percentages in A-Z, after which Wife owned a 51% controlling interest.

On July 28, 2009, Wife and, by extension, A-Z were awarded 8(a) certification. A-Z also qualified to compete for federal contracts set aside for small businesses in general, 13 C.F.R. § 121.101 (2017), for qualified HUBZone[5] small businesses, 13 C.F.R. § 126.100 (2017), and for woman-owned small businesses, 13 C.F.R. § 127.100 (2017). A-Z obtained its first government contract in April 2010, and a second followed shortly thereafter.   At the time of the hearing, A-Z had four government contracts, and its business had expanded to include eleven offices in six states.

Both parties contributed to A-Z's success.  While Husband was responsible for the financial aspects of the business, Wife was the "face" of the company.  She pursued the contracts, secured warehouse space, and hired employees.  Her focus was marketing and networking.  She also set up the initial quality control systems for A-Z.

At the time of trial, contracts with the Veterans Administration comprised 90% of A-Z's business.   Since obtaining 8(a) certification, the company had been highly profitable.  A-Z's ordinary business income since 2010 had been well over $200,000 a year.  The couple paid many expenses, including their mortgage, car payments, life and health insurance premiums, and the children's student loans, through A-Z.  Husband and Wife distributed all company profits to themselves.  Customarily, they received monthly distributions of $20,000.

## 2. Changes in A-Z's Financial Condition

During the pendency of the divorce, A-Z's financial situation deteriorated markedly.   Husband testified that, when the restraining order was dissolved, he discovered a company in disarray.  The Veterans Administration placed the company on month-to-month probation for October through December 2014 based on quality issues that arose during his absence.  The business checking account had a negative balance, and Wife had withdrawn all available funds from the line of credit.  He also discovered that Wife had used company funds to pay over $20,000 to a personal friend, Latda Vaughn,

---

[4] Federal government agencies set aside 23% of the available procurement contracts for small businesses.   15 U.S.C.A. § 644(g)(1)(A)(i) (Supp. 2017).   Within the overall percentage set aside for small businesses generally, a specific percentage of contracts are earmarked for small businesses with 8(a) certification, for qualified HUBZone small businesses, and for woman-owned and veteran-owned small businesses. *Id.* § 644(g)(1)(A).

[5] HUBZone is an acronym for Historically Underutilized Business Zone.   13 C.F.R. § 126.103. Through the HUBZone program, the Small Business Administration provides federal contracting assistance for qualified small businesses located in historically underutilized business zones in an effort to increase employment opportunities, investment, and economic development in such areas. *Id.* § 126.100.

4

and $14,000 to family members. Because of the company's poor financial condition, Husband did not withdraw his allotted $5,000 for personal expenses during the last three months of 2014 or in January 2015.

Husband took immediate steps to implement more oversight of the company's quality control system and increased communication with federal procurement officials. In December, based on the company's good performance, the Veterans Administration renewed the expiring contract. According to Husband, at the time of trial, all contracts were renewed, and none were in danger of termination for noncompliance. The cash balance in the business checking account also grew steadily during his tenure.

Wife testified that the company's cash flow issues were Husband's fault. She claimed that Husband remotely deleted A-Z's bookkeeping records for 2014, preventing her from making payroll or paying company bills and forcing her to hire two accountants, Erica Hayes and Latda Vaughn, to recreate the missing data.

In reality, Husband had not deleted the files, but had transferred them to an outside accountant for necessary upgrades. The "missing" files were returned in less than a week. Wife maintained that, even then, crucial data was missing, which necessitated additional work by Ms. Vaughn. But two accountants who regularly performed work for A-Z testified that Wife had a backup copy of the allegedly missing data on her computer. Ms. Vaughn admitted at trial that the work she performed did not benefit A-Z.

The court called Paul Demonbreun, a certified public accountant who had provided services to A-Z since its formation, to testify on two separate occasions about the company's financial health. Initially, he opined that the company's future was "much more cloudy" than in previous years. The company's debt load had increased and its cash flow had greatly diminished. In December 2014, the bank refused to renew the line of credit and notified the company to repay the loan immediately. Between February and July of 2015, the company only distributed a total of $20,000 to the parties, in addition to paying the couple's household bills.

When asked his opinion as to when the company would be able to return to its previous level of financial success, Mr. Demonbreun responded: "[I]t may take a year. It may take four years. It may not happen. It's going to be difficult." He was doubtful that either spouse would be able to enjoy the same standard of living post-divorce as during the marriage. But he conceded that, since Husband had returned to the company, the company's financial situation had improved.

Later, Mr. Demonbreun revised his opinion, explaining that even "[c]loudy skies do sometimes turn to blue." After reviewing the company finances for 2014, he determined that, even during the tumultuous divorce proceedings, the company's net

5

income was approximately $231,000. In the last few months, the company profits and the bank account balance had also increased.

Both Husband and Wife were optimistic about the future of the company. Each testified that, if they were awarded the business, they could pay $3,000 to $5,000 per month to the departing spouse. Mr. Demonbreun agreed that their estimate was realistic.

## C. FINAL ORDER

On October 15, 2015, the court issued its final order. The court found that numerous allegations in Wife's complaint for divorce were completely false or unsupported by evidence presented at trial. As a consequence of Wife's conduct, the Court awarded A-Z to Husband:

> Because of her misconduct in making gross misrepresentations to the Court when she filed her Complaint for divorce, because of her mismanagement of the business during the time Mr. Norman was locked out of the company prior to October 2, 2014, and because of Ms. Norman's failure to account for funds that she withdrew from the business in compliance with the orders of the Court and other conduct that resulted in the Court's barring her from the business in December 2014, the Court finds that the best prospect for successful operation of A-Z DME, LLC lies in the hands of Mr. Norman. For all of these reasons, the Court awards the business to him.

After considering the relevant statutory factors, the court divided the remaining marital assets. *See* Tenn. Code Ann. § 36-4-121(c) (Supp. 2016). The court also attributed to each spouse the amount of marital funds used for their respective attorney's fees and the marital funds each spouse had withdrawn from the estate without court authorization before the final hearing. Finally, the court added the total amount of marital funds Wife had dissipated to her portion of the marital estate.[6]

The court's division of marital assets resulted in Wife receiving $414,542.25 in marital assets while Husband received assets worth $610,042.12. "To equalize the division of marital property," the court granted Wife alimony in solido in a lump sum of $115,120.38. But the court provided that Husband could choose to pay the award in 48 monthly installments with interest. Next, the court allocated $61,128 of the marital debt to Wife and $106,439.63 to Husband. After accounting for the division of marital assets and the allocation of marital debt, Husband received 51.8% of the marital estate and Wife received 48.2%.

---

[6] The court found that Wife had dissipated marital assets through her payments to Ms. Vaughn, Ms. Hayes, and her family members. *See* Tenn. Code Ann. § 36-4-121(c)(5)(B).

6

To determine whether to award spousal support, the court reviewed the evidence in light of the appropriate factors. *See* Tenn. Code Ann. § 36-5-121(i) (2014). The court found that, during the marriage, the couple enjoyed a high standard of living. After the divorce, "both parties will have substantial and similar financial obligations and needs." Although the parties might not enjoy that same high standard of living after the divorce, Husband, as the recipient of the only income-producing marital asset, had a higher earning capacity than Wife. While A-Z was having financial difficulties at the time of trial, both parties were confident that they "could return it to its pre-divorce success." The court concluded that Husband had an earning capacity of $240,000 per year.

Based on Wife's testimony that she would need additional education to obtain the appropriate licenses to return to her former career as an elementary school teacher or a guidance counselor, the court ordered Husband to pay $2,000 per month for 48 months in rehabilitative alimony.

Even after Wife obtained the appropriate Tennessee license to pursue her former career, her potential income would not approach Husband's potential earnings from A-Z. The court determined that Wife "cannot be completely rehabilitated to the point where she will be able to enjoy a standard of living after the divorce comparable to the standard of living expected to be available" to Husband. The court awarded Wife alimony in futuro of $3,000 per month.

## II.

Husband appeals both the division of the marital estate and the award of alimony in futuro and rehabilitative alimony. Wife asks this Court to award her attorney's fees in defending this appeal.

### A. EQUITABLE DIVISION OF THE MARITAL ESTATE

1. Doctrine of Unclean Hands

As an initial matter, Husband contends that the court's division of the marital estate was inequitable because Wife was not held accountable for her false allegations in court pleadings and her mismanagement of A-Z. According to Husband, Wife is not entitled to "recover her share of the business" because she has unclean hands.

The doctrine of unclean hands is an equitable doctrine based on the principle that "he who seeks equity must do equity." *In re Estate of Boote*, 265 S.W.3d 402, 417 (Tenn. Ct. App. 2007). "When the doctrine applies, it provides the court with a basis to decline to grant relief to parties who have willfully engaged in unconscionable, inequitable, immoral, or illegal acts with regard to the subject matter of their claims." *Id.* (footnote omitted). But in divorce litigation, the doctrine only applies when the

inequitable conduct constitutes "fraud and deceit upon the court." *Chastain v. Chastain*, 559 S.W.2d 933, 935 (Tenn. 1977).

Wife obtained the ex parte restraining order through sworn allegations about Husband that were proven false. Our courts should never condone perjury because it "offends the basic principles underlying our judicial system." *Cummings v. Cummings*, No. M2003-00086-COA-R3-CV, 2004 WL 2346000, at *20 (Tenn. Ct. App. Oct. 15, 2004) (quoting *Wilder v. Wilder*, 863 S.W.2d 707, 713 (Tenn. Ct. App. 1992)). While perjury may justify the application of the unclean hands doctrine in a divorce case, it is not mandatory. *Id.* The decision as to whether to apply the doctrine is left to the discretion of the trial court after consideration of the unique facts and circumstance of each case. *Jolley v. Jolley*, No. M2011-02550-COA-R3-CV, 2013 WL 411454, at *3 (Tenn. Ct. App. Jan. 31, 2013) (citing *In re Estate of Boote*, 265 S.W.3d at 418); *Wilder*, 863 S.W.2d at 713-14.

Based on this record, we conclude that the trial court did not abuse its discretion in failing to apply the doctrine of unclean hands in the manner Husband requests. Much of the harm caused by Wife's conduct was alleviated by the time of trial,[7] and Husband was free to use her conduct against her. Instead of gaining an unfair advantage, Wife's conduct had the "effect of destroying [her] credibility with the [c]ourt." Courts have authority to punish or sanction perjury though a variety of means, including an adverse credibility finding. *Cummings*, 2004 WL 2346000, at *20 n.14. Contrary to Husband's claims, this is not a case in which a party with unclean hands went unpunished. The court awarded the couple's most valuable asset to Husband based on Wife's inequitable conduct and specifically held her accountable for wasting business assets and withdrawing marital funds without court authorization.

2. Equitable Distribution

Next, Husband argues that the court's division of the marital estate was inequitable because he was not awarded an additional $20,000, the court improperly allocated the student loan debt, and the division was not mathematically equal. To reach an equitable division, the trial court must weigh the relevant statutory factors. Tenn. Code Ann. § 36-4-121(c);[8] *Larsen-Ball v. Ball*, 301 S.W.3d 228, 234 (Tenn. 2010). The

---

[7] We are cognizant that Husband was forced to incur additional attorney's fees in responding to Wife's false allegations. But Husband has never requested that Wife be responsible for any portion of his attorney's fees in the court below or on appeal.

[8] The court must consider all relevant factors:

(1) The duration of the marriage;
(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

8

trial court's division is entitled to great weight on appeal and should not be overturned unless it "lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007) (quoting *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)). "We review the trial court's findings of fact de novo with a presumption of correctness and honor those findings unless the evidence preponderates to the contrary." *Larsen-Ball*, 301 S.W.3d at 234-35; Tenn. R. App. P. 13(d).

Husband maintains that he was entitled to an additional $20,000 in the equitable division to account for the marital funds he was allowed to use during the pendency of the divorce for personal expenses but chose not to accept. The mere fact that the trial court allowed the parties to use a portion of the marital assets while the divorce was pending does not create a right to those particular assets. The trial court retains the discretion to equitably divide the marital property "in proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1). Based on the record as a whole, we find no abuse of discretion in the court's refusal to award Husband an additional $20,000 in the division of the marital estate.

We also find no abuse of discretion in the court's allocation of the student loan debt. The court considered the appropriate factors, and the evidence does not preponderate against the court's findings. *See Alford v. Alford*, 120 S.W.3d 810, 814

---

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c).

9

(Tenn. 2003) (holding that courts are to apply four factors in allocating marital debt). Wife personally guaranteed the student loans and during the marriage both parties agreed that the business would pay the debt. The purpose of the debt was the children's higher education, which benefitted both parties equally. At trial, Husband agreed that, if he were awarded the business, he would continue to pay the student loans, and after the division of the estate, Husband was in the best position to repay the debt.

Finally, Husband contends that "to equalize the division of marital property" the court should have awarded $97,750 in alimony in solido instead of $115,120.38. We will not reverse a court's division of marital property because "it is not precisely equal." *Owens v. Owens*, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007). The division of marital property "is not a mechanical process." *Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003). In light of the particular facts of the case, some statutory factors may be more relevant than others. *See Tate v. Tate*, 138 S.W.3d 872, 875 (Tenn. Ct. App. 2003).

In the end, the court's division of the marital estate is judged by its results. *Altman v. Altman*, 181 S.W.3d 676, 683 (Tenn. Ct. App. 2005). After accounting for the division of marital assets and the allocation of marital debt, the court awarded 51.8% of the marital estate to Husband and 48.2% to Wife. An essentially equal division in a long-term marriage such as this one is appropriate. *See Phelps v. Phelps*, No. M2010-00856-COA-R3-CV, 2011 WL 2535026, at *6 (Tenn. Ct. App. June 24, 2011) (noting the general presumption that a long-term marriage supports an essentially equal division of the marital estate).

## B. SPOUSAL SUPPORT

Husband also takes issue with the trial court's award of spousal support.[9] "[T]rial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). In reviewing the trial court's award of alimony, we apply an abuse of discretion standard. *Id.* "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Id.* But we "are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998).

Tennessee law recognizes four types of alimony: (1) rehabilitative alimony; (2) transitional alimony; (3) alimony in future; and (4) alimony in solido. Tenn. Code Ann.

---

[9] Contrary to Husband's assertion, Wife's complaint for divorce included a request for all available types of alimony.

§ 36-5-121(d)(1).  While the Legislature has expressed a preference for rehabilitative or transitional alimony awards rather than long-term support, "courts should not refrain . . . from awarding long-term support when appropriate."  *Robertson v. Robertson*, 76 S.W.3d 337, 341-42 (Tenn. 2002).  Alimony decisions are factually driven and "involve[] the careful balancing of many factors."  *Gonsewski*, 350 S.W.3d at 105.  In determining whether to award alimony, courts must carefully weigh the factors in Tennessee Code Annotated § 36-5-121(i).[10]  The two most important factors are "the disadvantaged spouse's need and the obligor spouse's ability to pay."  *Id.* at 110 (citation omitted).

1.  Interest on Alimony in Solido

We first address Husband's claim that the trial court erred in requiring him to pay interest on the award of alimony in solido, relying on *Price v. Price*, 472 S.W.2d 732, 734 (Tenn. 1971).  Alimony in solido can be payable either in a lump sum or in installments.  Tenn. Code Ann. § 36-5-121(h)(1).  In *Price*, our supreme court held that the recipient of an award of alimony in solido payable in installments is not entitled to

---

[10] The factors include:

   (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
   (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
   (3) The duration of the marriage;
   (4) The age and mental condition of each party;
   (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
   (6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
   (7) The separate assets of each party, both real and personal, tangible and intangible;
   (8) The provisions made with regard to the marital property, as defined in § 36-4-121;
   (9) The standard of living of the parties established during the marriage;
   (10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
   (11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
   (12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i).

interest on the judgment from the date of entry. 472 S.W.2d at 734. Instead, interest is only payable after an installment is past due. *Id.* Here, the court clearly designated the award as payable immediately. Because Wife was entitled to the use of the money from the date of the judgment, the court did not err in its award of interest.

2. Rehabilitative Alimony and Alimony in Futuro

Husband also argues that the awards of alimony in futuro and rehabilitative alimony were based on a clearly erroneous assessment of the evidence. He maintains that Wife is not economically disadvantaged or in need of rehabilitation.

We conclude that the evidence does not preponderate against the court's finding that Husband has an earning capacity of $240,000. Before the divorce filing, the parties received $20,000 in monthly distributions from A-Z even after the company paid many of their household expenses. After the divorce, Husband will be the sole beneficiary of that income. While at trial Husband was optimistic about the company's future, on appeal, he argues that A-Z's financial health is in doubt, relying on Mr. Demonbreun's initial testimony. But Mr. Demonbreun revised his opinion after reviewing the company's 2014 financial records. Although the turmoil of the divorce proceedings drastically reduced the available distributions for a period of time, under Husband's direction, the company's cash balance was steadily increasing. Mr. Demonbreun agreed that "when there's no turmoil in this company, it makes money."

We also conclude that the evidence does not preponderate against the trial court's finding that Wife's earning capacity was limited to the income she would receive as an elementary school teacher or a guidance counselor. Wife has a bachelor's degree in interdisciplinary studies and master's degrees in guidance and psychotherapy. Before the parties started their business, her only work experience was as an elementary school teacher and a guidance counselor. Although Husband claims that Wife could start her own business using the skills she acquired at A-Z, there is no evidence in this record that Wife had such plans. When faced with the prospect of losing A-Z, she contacted the appropriate Tennessee licensure boards to ascertain the requirements for returning to her former career. After obtaining a Tennessee license, Wife's starting salary as a teacher is anticipated to be $43,000.

On this record, we find no error in the court's determination that Wife was relatively economically disadvantaged. This is a long-term marriage of 22 years. Neither party has any separate property. Since 2009, Husband and Wife devoted all their time and energy to A-Z. Both parties contributed to A-Z's financial success, which allowed them to enjoy a high standard of living. The court divided the marital estate essentially equally but awarded A-Z, the only income-producing asset, to Husband. Without the business she helped to build, Wife will be forced to start anew while Husband enjoys greater economic potential. Husband's higher earning capacity post-divorce can be

directly linked to Wife's efforts to establish and grow the business. After Wife pays the debt allocated to her, she will be left with a small retirement fund and a limited amount of cash from the sale of the marital residence. *See Stratienko v. Stratienko*, No. E2016-00542-COA-R3-CV, 2017 WL 1205935, at *11 (Tenn. Ct. App. Mar. 31, 2017) (finding Wife relatively economically disadvantaged despite Wife's education and work experience in the parties' businesses).

Husband also claims that Wife's education and business skills preponderate against a finding that she needs rehabilitation. We disagree. This record includes no evidence that Wife could support herself with her newly acquired business skills. *See Lubell v. Lubell*, No. E2014-01269-COA-R3-CV, 2015 WL 7068559, at *18 (Tenn. Ct. App. Nov. 12, 2015) (noting that Wife's work experience at business operated with Husband may not easily transfer to post-divorce employment). What the evidence does establish is that Wife needs an additional twelve hours of graduate education to obtain a license to teach in Tennessee. Rehabilitative alimony is appropriate when an economically disadvantaged spouse needs additional education or training to become self-sufficient after the divorce. *Gonsewski*, 350 S.W.3d at 108.

Because Wife is relatively economically disadvantaged and can only be partially rehabilitated, an award of alimony in futuro in addition to rehabilitative alimony is appropriate. Tenn. Code Ann. § 36-5-121(d)(4); *see, e.g.*, *Lunn v. Lunn*, No. E2014-00865-COA-R3-CV, 2015 WL 4187344, at *11 (Tenn. Ct. App. June 29, 2015); *Andrews v. Andrews*, 344 S.W.3d 321, 344 (Tenn. Ct. App. 2010). In addition to the types of alimony awarded, however, we must also consider Husband's challenge to the amount of the award.

3. Amount of Alimony

Husband contends that the total amount of alimony awarded exceeds his ability to pay. Husband is obligated to pay $5,000 a month in spousal support for four years, and then $3,000 a month thereafter. Husband testified that he could pay $3,000 to $5,000 a month, and Mr. Demonbreun agreed that this was a realistic number. But if Husband chooses to pay the alimony in solido award in 48 monthly installments, his alimony obligation will increase to $7,664.19 a month, plus interest, for the first four years. While this amount exceeds what Husband testified he could pay, we cannot say the evidence preponderates against the alimony amount awarded. Mr. Demonbreun testified that the company's 2014 taxable income was $231,000. This annual figure approaches the company's previous taxable income which allowed the couple to receive $20,000 in distributions each month. We conclude the court did not abuse its discretion in determining that Husband had the ability to pay $7,664.19 per month in spousal support.

## C. ATTORNEY'S FEES ON APPEAL

Wife requests that we award her attorney's fees incurred in defending this appeal. An award of attorney's fees on appeal is a matter within this Court's sound discretion. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). When this Court considers a request for attorney's fees on appeal, we consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other equitable factors relevant in a given case. *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005). When we consider all of the relevant factors in this case, we respectfully decline to exercise our discretion to award Wife her attorney's fees.

## III.

For the foregoing reasons, we affirm the court's decision.

_____
W. NEAL MCBRAYER, JUDGE

14